945 A.2d 59 (2008)
399 N.J. Super. 486
MOUNTAIN HILL, L.L.C., a New Jersey Limited Liability Company, Plaintiff-Appellant,
v.
TOWNSHIP OF MIDDLETOWN, Peter Carton, Esq., Joan Smith, Rose-Marie Peters, Patrick Parkinson, James Hinckley, Judith Stanley and Clifford Raich, Defendants-Respondents.
No. A-1328-05T3
Superior Court of New Jersey, Appellate Division.
Argued January 22, 2008.
Decided April 7, 2008.
*60 Gary E. Fox, Ocean Township, argued the cause for appellant (Fox & Melofchik and Hill Wallack, attorneys; Mr. Fox and Anne Studholme, Newark, on the brief).
Bernard M. Reilly, Red Bank, argued the cause for respondents (Dowd & Reilly, attorneys; Mr. Reilly, on the brief).
Before Judges STERN, COLLESTER and C.L. MINIMAN.
The opinion of the court was delivered by C.L. MINIMAN, J.A.D.
Plaintiff Mountain Hill, L.L.C., appeals the dismissal of its action under the Open Public Meetings Act (OPMA), N.J.S.A. 10:4-6 to -21, against defendants Township of Middletown (the Township); Peter Carton, the Chairman of the Township Municipal Republican Party; Joan Smith, a Township Committee member; Rosemarie Peters, the Township Mayor; Patrick Parkinson, a Township Committee member; James Hinkley, Chairman of the Township Board of Adjustment and President of the Middletown Republican Club; Judith Stanley, Chairperson of the Township Planning Board; and Clifford Raich, a member of the Township Planning Board and Vice-President of the Middletown Republican Club. The matter was tried to a conclusion before a Chancery Division judge, who issued a written opinion and concluded that the OPMA had not been violated. We affirm.

I.
This appeal is one of four appeals argued before us on January 22, 2008,[1] with a fifth appeal scheduled for argument on April 7, 2008. In this appeal plaintiff contends that the Committee violated the OPMA when its members discussed at closed political caucus meetings three proposed, and later adopted, ordinances that would adversely affect plaintiff's property. We have previously decided appeals concerning two of those adopted ordinances, one on July 5, 2002, and the other on April 16, 2003. Mountain Hill, LLC v. Middletown Twp., 353 N.J.Super. 57, 801 A.2d 412 (App.Div.), certif. denied, 175 N.J. 78, 812 A.2d 1110 (2002) (Mountain Hill I); Mountain Hill, LLC v. Middletown Twp., Nos. A-1968-01, A-2556-01 (App. Div. April 16, 2003) (Mountain Hill II). The third ordinance was adopted in 2004.
In Mountain Hill I we set forth the following facts:
Middletown Township is a large suburban municipality located in northeast Monmouth County. Middletown is governed *61 by a five member committee pursuant to a special charter enacted by the Legislature in 1971. Mountain Hill, LLC is the owner and/or contract purchaser of a tract of approximately 135 acres, mostly vacant, with extensive frontage along northbound State Highway 35 in Middletown.
In 1993, the Middletown Township Planning Board adopted a master plan which recommended that a substantial portion of Mountain Hill's property be zoned for mixed uses. In 1994, the Township Committee rezoned 85 acres of Mountain Hill's tract from business and industrial uses to the newly created PD (planned development) zone, which allowed mixed uses. The balance of the tract, 50 acres, remained in the M-1 (light industrial) zone. No amendments to the PD zone were enacted by the Township Committee from 1994 through 2000.
In September 2000, Mountain Hill filed an application with the Middletown Township Zoning Board seeking a use variance for the 50 acres still zoned industrial to allow Mountain Hill to develop a commercial/residential project on its entire 135 acre tract. The project was named the "Middletown Town Center." The proposal generated a substantial public controversy.
In March 2001, the Township Committee introduced Ordinance 2001-2632 which sought to amend and "down-zone" the existing PD zone, substantially reducing what Mountain Hill could build on its property. Mountain Hill filed a valid protest under N.J.S.A. 40:55D-63 objecting to the proposed zoning ordinance. At the June 4, 2001 Township meeting, the proposed ordinance was discussed. One of the members recused himself because of a conflict of interest. During the meeting, one of the four remaining members stated that "[f]or anything to pass here, it's going to require all four of us. All right. Just understand that. Anyone of us can block this whole ordinance." The Township's attorney did not comment on this statement. The ordinance was ultimately rejected by the Township Committee.
On June 18, 2001, the Township Committee proposed Ordinance 2001-2644, which also sought to "down-zone" the PD zone. Mountain Hill again filed a valid protest under N.J.S.A. 40:55D-63 objecting to the proposed ordinance. At the public hearing on July 2, 2001, the Township's attorney announced that one of the five committee members present, Mr. Brodsky, had "recused himself with regard to this matter, as he has in the past. . . ." He then advised the Township Committee that "if a member has recused themselves, they are, in essence, resigned from the Committee for purposes of this application which means that effectively there are four, all the members of [the] governing body are four." Accordingly, he concluded that three affirmative votes [were] needed to carry the ordinance under N.J.S.A. 40:55D-63. Following that discussion the vote was taken, with three votes in the affirmative and one vote in the negative, and the ordinance declared adopted.
[Mountain Hill I, 353 N.J.Super. at 59-61, 801 A.2d 412.]
We then held that N.J.S.A. 40:55D-63 requires that an ordinance be passed by two-thirds of all of the members of a municipal body, even though one or more do not vote on a particular municipal ordinance. Id. at 65, 801 A.2d 412. Because the Township Committee is comprised of five members, we held that the down-zone ordinance could only be adopted by four affirmative votes, not three as the Township's *62 attorney advised. Id. at 66, 801 A.2d 412. Thus, we affirmed the judgment vacating the July 2, 2001, ordinance downzoning the PD zone.
In Mountain Hill II we considered Ordinance 2001-2617 relating to open-space requirements and providing "that `not more than 50% of the area set aside shall consist of wetlands, open bodies of water or water courses, sloped areas of 25% or greater, detention or retention basins, swales and other drainage structures.'" Mountain Hill II, supra, slip op. at 2. The trial judge concluded that the ordinance was invalid because it conflicted with the definition of "open space" in N.J.S.A. 40:55D-5 and Rick Brodsky, Esquire, one of the Township Committee members approving "the ordinance[,] had a disqualifying conflict of interest." Ibid. We stated the following facts that are relevant here:
Plaintiff is owned by Joseph Azzolina, Jr., and his cousin Phil Scadutto. It possesses or has contracted to purchase approximately eighty-five acres of land, which makes up almost all of the property in the Township's [PD] zone. Other members of the Scadutto and Azzolina families also own land and businesses in Middletown.[2] . . .
In "mid-2000," plaintiff publicized a concept plan to construct a mixed-use development that would include 1,700,000 square feet of retail and office space and over 400 residential units, including twenty-five affordable housing units. The proposed development generated substantial interest among Township officials and members of the public, many of whom opposed the proposal. The project also required a variance as some of the property was located within a light industrial zone. While the variance application was pending, the Township considered several ordinance changes, including the Ordinance in issue and another ordinance reducing the floor area ratio in the PD Zone.
[Id., slip op. at 3-4.]
The open-space ordinance was adopted on February 20, 2001,[3] by a unanimous vote. "Brodsky was a partner in the law firm of Ansell, Zaro, Grimm and Aaron, which had represented plaintiff, plaintiff's principals, and persons related to plaintiff's principals, for over thirty years." Id., slip op. at 5-6. Plaintiff made no objection to Brodsky's presence that day because he had assured. "Azzolina that he would not participate in any matters regarding the PD Zone, and the governing body had instructed Brodsky not to participate in any issues regarding the PD Zone." Id., slip op. at 6. We affirmed the invalidation of the ordinance based on Brodsky's conflict of interest and did not address the other basis for declaring the ordinance invalid. Id., slip op. at 16.
With the facts developed in Mountain Hill I and Mountain Hill II as background, additional facts were developed in the trial of this action.[4] Carton was the Chairman of the Municipal Republican Party from 1994 through 2004. Throughout that time every Township Committee member was a Republican. Brodsky was first elected to the Township Committee in November 1995 and was a Committee *63 member from 1996 through 2003.[5] The other members of the Township Committee from January 1996 through 2003 were Rosemary Peters, Ray O'Grady, Parkinson and Smith. The Mayor, who is always a Committee member, was elected by the Township Committee each January.
Regular Township Committee meetings are held on the first and third Mondays of the month and take place at Town Hall, with an executive session at 7:00 p.m. followed by a public meeting at 8:00 p.m. Every Thursday each Committee member receives a packet of materials delivered to his or her home whether or not a meeting is scheduled for the following Monday. The packet contains correspondence of all types, including citizen complaints and correspondence regarding bond resolutions and grants; internal memoranda; announcements of events in the Township; monthly reports from various departments and the minutes of the Township Board of Adjustment and Planning Board. On Thursdays before Monday public meetings, the packet contains the agenda for the meeting. If an ordinance is on the agenda, a draft of the ordinance is also included in the packet. The packet was generally about three inches thick.
As a Committee member Brodsky was invited to Municipal Republican Party political caucus meetings on Saturdays at either Carton's home or a Committee member's home. There are at least three political caucus meetings per year but the meetings could be more frequent and some years as many as ten political caucus meetings occur. Carton or Raich and all of the Committee members would attend these meetings.[6] Generally, no one else was in attendance nor did the Committee members ever meet without Carton or Raich. Brodsky understood that the presence of some Republicans other than Committee members was required to call the meeting a political caucus.
At the political caucus meetings, the group discussed campaign issues and campaign strategy. Sometimes, political consultants attended the political caucus meetings. During at least one of the political caucus meetings, a Republican Club member was there and the discussion was generally about bumper stickers, lawn signs and campaign platform issues. Brodsky testified:
I remember meeting with political consultants with regard to campaign strategy, positions the opposition party was taking, positions we wanted to take, platforms, budgetary items, things like that. We would also discuss political ramifications of things that were going on in the town, whether it would be a controversial application at the Planning Board, zoning board, events or other concerns or goings on in town from a political perspective in terms of you know, what effect that would have, what we thought about it, that kind of thing.
The Committee members would not discuss how to vote on any particular project. However "there may very well have been and probably were discussions with regard to an action that may be taken by the Township Committee [and] what the political ramification of that action would be." *64 The discussion of issues coming before the Township Committee would be repeated at the Committee meeting. No minutes or records were created of these political caucus meetings and no formal agenda was prepared for them. Carton would call and lead the political caucus meetings.
Brodsky would occasionally take the Thursday packet to political caucus meetings, although no one asked him to bring it. Generally, the Committee members did not do so. There was no discussion of how people were going to vote on an ordinance or how it would be beneficial for the party as a group to vote one particular way. There were no straw votes or agreements on voting. However, the Mountain Hill project and the proposed ordinances affecting it would be discussed at the political caucus meetings. Whenever it seemed that Mountain Hill would be discussed at a political caucus meeting, Brodsky would absent himself and at regular Committee meetings he would not vote on any issue affecting Mountain Hill with the one exception, the open-space ordinance, which triggered invalidation of that ordinance. Brodsky stopped going to the political caucus meetings altogether after the 2001 elections. Thus, by the end of 2001 only three Committee members were attending political caucus meetings.
At the February 20, 2001, Planning Board meeting at which the open-space ordinance was adopted, Fox found copies of a press release on a bench in Town Hall. The press release stated that the open-space ordinance had been adopted and that it was the latest step undertaken by the Township Committee to preserve open space. The press release quoted comments by Brodsky and Smith. This press release was distributed before the meeting began. The ordinance was in fact adopted on February 20, 2001. Fox concluded that the Township Committee had already discussed the ordinance and agreed to adopt it. However, Smith denied speaking with Herrschaft before the meeting and denied that she used the exact words quoted, although she admitted she may have said something similar to the quoted comment.
On June 18, 2001, the down-zone ordinance was adopted on first reading. Smith, Peters and Parkinson voted yes and Brodsky and O'Grady abstained. On June 28, 2001, the Planning Board had a special meeting to review the proposed ordinance. The Planning Board voted unanimously to approve it with certain amendments. On July 2, 2001, the Township Committee held a public hearing on the down-zone ordinance, which would reduce the amount of square footage allowed in the PD zone by thirty percent. It would also reduce the allowable building area in plaintiff's project by about 350,000 square feet. The ordinance was then adopted with Smith, Peters and Parkinson voting yes and O'Grady voting no. Before the meeting began a fact sheet was placed on the benches in Town Hall, which stated that the ordinance was part of the governing body's efforts to reduce the impact of developments on Route 35 and Route 36 and announced its adoption.
Herrschaft testified that she provided public information to the media to explain things that occurred in the Township. She would get the agenda for a Committee meeting on the Thursday or Friday before the meeting. Then, prior to Monday meetings, and
[d]epending on the agenda and what's on it, we can prepare some version of a press release with the intent of really assisting a reporter as a professional tool to help them with background and for them to meet  some of them have pretty tight deadlines on the Monday meeting. The Asbury Park Press is actually a 10:30 that night deadline. And *65 then the weekly papers are early in the week. So that it's helpful to them to have some of the background information and some of the materials in advance so that they can put their story together and put it together accurately, which is good for everybody.
Based on her education in journalism and her experience as a reporter, she would decide which issues would interest the press and would prepare a press release and hand them out to reporters and others asking for them. She would base the press release on the materials relating to the issue, such as draft ordinances, and from conversations with staff and Committee members. She denied that she had any sense in advance of the meeting of what the Committee thought about any issue and she would not speak to all of the Committee members on any issue.
The quotations from Smith and Brodsky in the February 20, 2001, press release were the result of discussions with them before the meeting. Sometimes Herrschaft would create the quotations herself based on the discussions and may have done so on this occasion, but Smith and Brodsky would approve the quotations before she distributed the press release. Herrschaft denied knowing whether the ordinance would be adopted when she prepared the February 20, 2001, press release. The statement that the ordinance was adopted was merely her prognostication of the outcome.
Herrschaft also prepared summaries of proposed ordinances, which were made available to the press and others. She prepared such a summary of the down-zone ordinance, which described its various provisions. She did not know if the down-zone ordinance would be adopted when she prepared this fact sheet.
Plaintiff filed this action on October 17, 2003, after Mountain Hill I and Mountain Hill, II were decided. Plaintiff alleged that the political caucus meetings violated the OPMA. It sought temporary and permanent injunctions barring defendant from discussing plaintiff's project as a group at any private location, requiring that agendas be prepared for any political caucus meeting and appointing a master to monitor the meetings until plaintiff's application and all appeals from municipal actions on plaintiff's application had been finalized.

II.
The court found that between 2001 and 2004 the Township Committee adopted two ordinances that affected the land that could be devoted to the Town Center and the uses that were permitted along Route 35.[7] The court found that the ordinances were "subject to extensive public hearings both before the Township Planning Board and Township Committee and each was the subject of large scale and comprehensive studies conducted by the Township's professional planning staff." Based on the depositions of O'Grady, Brodsky and Smith, the judge found there was not the "slightest hint" that the political caucus meetings ran afoul of the OPMA.
The judge held that, while the OPMA is to be liberally construed, it is nonetheless "clearly in contravention of the common law." Therefore, the judge concluded that the OPMA must be applied in "concert with the underlying principle that enactments in derogation of the common law are generally construed strictly."
*66 The judge rejected plaintiff's argument that, since all of the Committee members were Republicans and some of them discussed the political implications of plaintiffs project at political caucus meetings, there was a violation of the OPMA. The judge found that defendants acknowledged plaintiff's application was discussed during political caucus meetings but the judge concluded that those discussions did not violate the OPMA because the OPMA specifically permits "typical partisan caucus meetings," citing N.J.S.A. 10:4-7.
The court found that plaintiff did not meet its burden to prove that the closed political caucus meetings were anything more than "typical partisan caucus meetings." Instead, the record revealed that "any discussions regarding the Town Center project were limited solely to the political ramifications of the propose[d] project." Indeed, the judge found that the exclusion of O'Grady from the political caucus meetings underscored the political nature of those meetings.
The court held that plaintiff had not shown a relationship between the political caucus meetings and the actions of the Township Committee in passing the 2001 and 2004 ordinances. Nor did plaintiff prove that any Committee action was the result of a "secret methodology." Furthermore, there was no evidence that the political caucus meetings led to any predetermined actions. The judge concluded that plaintiff had failed to demonstrate "that the purpose of the political caucuses at issue were to circumvent the [OPMA] or to hold discussions or take action in violation of the OPMA." The court also rejected plaintiffs reliance on the press release available at the February. 20, 2001 Committee meeting. "The press release . . . simply includes quotes from committee members Brodsky and Smith concerning the benefits of preserving open space in the Township." The judge concluded that the press release did not "create a viable nexus between the political caucus meetings and the passing of the open space ordinance." The judge similarly rejected plaintiff's claim that the fact sheet describing the down-zone ordinance revealed a preordained action. Accordingly, the judge found that no violation of the OPMA had occurred and he dismissed the complaint.

III.
In this appeal, plaintiff raises four main issues. First, plaintiff contends that the judge erred in strictly construing the OPMA's full disclosure provisions rather than strictly construing the exceptions thereto. Second, plaintiff urges that the private Republican meetings were required by the OPMA to be open to the public. Third, plaintiff argues that such meetings were not an exception to the requirements of the OPMA. Fourth, plaintiff asserts that the judge should have (1) declared that the meetings violated the OPMA, (2) enjoined any such future meetings and (3) voided the 2004 amendments to the Township zoning, ordinance applicable to plaintiff's property.
Our review of a judge's findings of fact in a bench trial is limited.
[O]ur courts have held that the findings on which [a judgment in a bench trial is] based should not be disturbed unless "they are so wholly insupportable as to result in a denial of justice," and that the appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter. That the finding reviewed is based on factual determinations in which matters of credibility are involved is not without significance. Findings by the trial judge are considered binding on appeal when *67 supported by adequate, substantial and credible evidence. It has otherwise been stated that "our appellate function is a limited one: we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," and the appellate court therefore ponders whether, on the contrary, there is substantial evidence in support of the trial judge's findings and conclusions.
[Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974), (citations omitted).]
See also Soger v. O.A. Peterson Constr. Co., 182 N.J. 156, 163-64, 862 A.2d 1119 (2004); Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 293, 777 A.2d 334 (2001), cert, denied, 535 U.S. 1077, 122 S.Ct. 1959, 152 L.Ed.2d 1020 (2002); Pasquince v. Brighton Arms Apts., 378 N.J.Super. 588, 593, 876 A.2d 834 (App. Div.2005):
Thus, "[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." State v. Barone, 147 N.J. 599, 615, 689 A.2d 132 (1997). We are not in a good position to judge credibility and ordinarily should not make new credibility findings. Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969); Trusky v. Ford Motor Co., 19 N.J.Super. 100, 104, 88 A.2d 235 (1952). However, our review of the sufficiency of the facts to satisfy an applicable legal standard is a question of law. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). Thus, our review of whether the facts establish a violation of the OPMA is plenary.

IV.
Relying on the holding in Polillo v. Deane, 74 N.J. 562, 569, 379 A.2d 211 (1977), plaintiff asserts that the judge erroneously held that the OPMA should be strictly construed because it was adopted in derogation of the common law. Plaintiff also asserts that the trial judge erred when he failed to strictly construe the exceptions to the OPMA. Instead, plaintiff argues, the OPMA should be liberally construed and the exceptions should be strictly construed.
The OPMA was adopted in 1975, effective January 19, 1976. L. 1975, c. 231, § 1. In introducing the bill to the Assembly, the following discussion was included in the Introductory Statement:
This bill requires that the public and the press have advance notice of and the opportunity to attend most meetings, including executive sessions, of public bodies, except where the public interest or individual rights would be jeopardized. The public's right to know the process by which governmental decisions are made and to witness that process in full detail may be obstructed by needlessly barring members of the public and the press from certain policy-making meetings of public bodies. If the public and the press cannot attend, they cannot learn of many positions that are considered or taken at such meetings by individual officials serving the public. Lack of this information can lessen public confidence in governmental decisions and impair the public's function of holding officials accountable in a democracy.
[Introductory Statement, Assembly No. 1030, L. 1975, c. 231.]
The OPMA contains Legislative findings and declarations:

*68 The Legislature finds and declares that the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies, is vital to the enhancement and proper functioning of the democratic process; that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society, and hereby declares it to be the public policy of this State to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way except only in those circumstances where otherwise the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion.
. . . .
The Legislature, therefore, declares that it is the understanding and the intention of the Legislature that in order to be covered by the provisions of this act a public body must be organized by law and be collectively empowered as a multi-member voting body to spend public funds or affect persons' rights; that . . . therefore, typical partisan caucus meetings and chance encounters of members of public bodies are neither covered by the provisions of this act, nor are they intended to be so covered.
[N.J.S.A. 10:4-7.]
Lest there by any doubt about how to construe the OPMA, the Legislature required that "[t]his act shall be liberally construed in order to accomplish its purpose and the public policy of this State as set forth in [N.J.S.A. 10:4-7]." N.J.S.A. 10:4-21. No reported decision construing the OPMA was cited by the trial judge in support of the proposition that the OPMA was in derogation of the common law, requiring a court to balance the statutorily mandated liberal construction against the principle that statutes in derogation of the common law be strictly construed, nor have we found any such decision. Indeed, the Supreme Court has held that the public's right of access to public meetings is founded on common law rights to public information "`dating back to the first half of the 18th century.'" Tarus v. Borough of Pine Hill, 189 N.J. 497, 507, 916 A.2d 1036 (2007) (citing Polillo, supra, 74 N.J. at 570, 379 A.2d 211). Thus, the OPMA is not in derogation of the common law and the trial judge erred in holding that it was.
We have held that the OPMA is to be liberally construed. Rice v. Union County Reg'l High Sch. Bd. of Educ., 155 N.J.Super. 64, 70, 382 A.2d 386 (App.Div. 1977), certif. denied, 76 N.J. 238, 386 A.2d 863 (1978). "[S]trict adherence to the letter of the law is required in considering whether a violation of the [OPMA] has occurred." Polillo, supra, 74 N.J. at 578, 379 A.2d 211; Rice, supra, 155 N.J.Super. at 70, 382 A.2d 386. "[A]ny exception to full disclosure under the [OPMA] should be strictly construed." S. Jersey Publ'g Co., Inc. v. N.J. Expressway Auth., 124 N.J. 478, 492, 591 A.2d 921 (1991). Accordingly, the exceptions to the Act, including "typical partisan caucus meetings," must be strictly construed.

V.
Plaintiff contends that the political caucus meetings of the Municipal Republican Party were not typical partisan caucus meetings and were subject to the OPMA It claims that the group of attendees was a "public body" as defined by the OPMA in N.J.S.A. 10:4-8(a). It further claims that the Township Committee was a group of *69 five members, three of whom were sufficient to transact the business of Middletown[8] and that the presence of Carton at the meetings did not transform the meetings into typical partisan caucus meetings.
Plaintiff also contends that the political caucus meetings were "meetings" as defined by N.J.S.A. 10:4-8(b). It contends that the Committee members "would bring the agenda and materials that they had been provided with on Thursday to these Saturday private meetings" and the group would discuss issues on the agenda for the following Monday public meeting.
The determination of whether the political caucus meetings are exempt from the OPMA requirements is pivotal to the balance of plaintiff's arguments. Plaintiff correctly points out that there is nothing in the OPMA that defines a "typical partisan caucus." However, plaintiff asserts that the political caucus meetings were really "secret" Township Committee meetings, not a "typical partisan caucus." Plaintiff argues that Witt v. Gloucester County Board of Chosen Freeholders, 94 N.J. 422, 466 A.2d 574 (1983), and South Harrison Township Committee v. Board of Chosen Freeholders of Gloucester County, 210 N.J.Super. 370, 510 A.2d 42 (App.Div.), certif. denied, 104 N.J. 372, 517 A.2d 383 (1986), compel a conclusion that the political caucus meetings are not exempt from the OPMA.
In Witt the Court discussed problems with the typical partisan caucus exception to the OPMA. Witt, supra, 94 N.J. at 430-31, 466 A.2d 574. There, the Republican Party controlled the Board immediately prior to the 1981 general election. Id. at 426-27, 466 A.2d 574: After the election, control shifted to the Democratic Party, effective January 1982. Id. at 427, 466 A.2d 574. However, in the interim following the election, the Republican-controlled "Board held a `work session' or agenda meeting on December 1, 1981, to discuss the agenda for a regularly scheduled meeting" on December 2. Ibid. A copy of the agenda was placed on each freeholder's desk with two proposed resolutions. Ibid. One of the resolutions enlarged the membership of the Gloucester County Utilities Authority from five to nine members. Ibid. The second resolution appointed four new members to the Authority. Ibid.
"[T]he public had the opportunity to discuss the two resolutions at the public portion of the December 2 meeting"; however, "the part of the meeting when the resolutions were specifically considered was closed to the public." Ibid. Democratic members of the Board questioned the expansion and called it "strictly political." Ibid. The Board adopted the resolutions by a 5-2 vote along partisan lines. Id. at 428, 466 A.2d 574. On January 13, 1982, the reconstituted Board, now controlled by the Democratic Party, passed a resolution to decrease the Authority's membership to five. Ibid.
Witt, the Chairman of the Authority and of the Democratic Party County Committee, filed a complaint in lieu of prerogative writ and alleged a violation of the OPMA. Ibid. The trial court found that neither the December 2 nor the January 13 resolutions were arbitrary or unreasonable. Id. at 428-29, 466 A.2d 574. The court made no determination regarding the OPMA. Id. at 429, 466 A.2d 574.
"On appeal, the Appellate Division acknowledged the record was `somewhat vague.'" Ibid. "Without referring to any evidence, the court found . . . that the *70 `majority bloc agreed privately, in advance, on the individuals to be appointed to the four new positions.'" Ibid. Based on this finding, we determined that "the majority had violated the [OPMA]" because the Board had not delivered "an agenda including notice of the resolutions forty-eight hours before the December 2 meeting," as required by N.J.S.A. 10:4-8(d). Ibid. We assumed that the majority "caucused in advance to obtain agreement on the resolutions," and, citing N.J.S.A. 10:4-11, we held that the majority "had contravened that part of the act prohibiting the omission of an invitation by a public body to `a portion of its members to a meeting for the purpose of circumventing the provisions of this act.'" Ibid.
The Supreme Court noted "that typical partisan political caucus meetings and chance encounters of members of public bodies are neither covered nor intended to be covered by [the OPMA]." Id. at 430, 466 A.2d 574. The Court also observed that "[u]nfortunately, nothing on the face of the statute or in its legislative history indicates what is a `typical partisan caucus.'" Id. at 431, 466 A.2d 574.
As a result, the act leaves a gap between its mandate that meetings of public bodies be open to the public and its authorization that all or an effective majority of the members of those bodies may meet in a typical partisan caucus. On one side of the gap is the provision that "[n]o person or public body shall fail to invite a portion of its members to a meeting for the purpose of circumventing the provisions of this act." N.J.S.A. 10:4-11. On the other side is the exception for a "typical partisan caucus." In an apparent attempt to bridge the gap, the Department of State in its Guidelines on the Open Public Meetings Law (1975) explained:
Since a political caucus is only open to one party and would not be open to all the members of the public body, it would not be required to be held in open session. Of course, if all the members of a public body were from one political party, the Law would not allow them to hold closed meetings by simply calling them political caucuses. Nor would the Law allow an effective majority of the members of the public body to use the political caucus mechanism to circumvent the Law's provisions.
Does the law require that both discussion and voting take place in public? Answer: Yes [Guidelines on the Open Public Meetings Law 4-5 (1975)].

Nonetheless, discussion of the merits of an issue, including its importance to the party and a proposed party position, is to be expected at a typical partisan caucus. We are acutely aware that the act leaves public officials wandering in a land of shadows between typical partisan caucuses and open public meetings. Preferably, a more precise delineation of the boundaries of the two different gatherings should come from the Legislature, which drew the distinction, not the courts.
[Ibid. (emphasis added).]
The Court held that "drawing the distinction [was] not essential to the disposition of the case." Ibid. It found that there was no evidence in the record "that the Republican majority met in a typical partisan political caucus or any other kind of meeting." Ibid. The Court therefore rejected our conclusion that the resolutions were products of a private meeting. Id. at 432, 466 A.2d 574.
In South Harrison the Board of Chosen Freeholders amended the Gloucester County Solid Waste Management Plan "to designate a site in South Harrison Township *71 as the location of a county-wide landfill." South Harrison, supra, 210 N.J.Super. at 372, 510 A.2d 42. Immediately after the County was ordered to implement an operational landfill within its borders in twelve months, the Board in late November 1984 hired Speitel Associates as environmental and engineering consultants to help it select a site and implement a new county landfill. Id. at 373, 510 A.2d 42.
Private partisan meetings were held on December 10 and 11, 1984, and public meetings were held on December 27 and 28. Ibid. The first private meeting was held at the home of the assistant county counsel for environmental affairs and was attended by the five Democratic freeholders, the freeholder director, two representatives of Speitel Associates and the county planner. Ibid. The second private meeting was held at the Gloucester County Courthouse Complex and was attended by two Republican freeholders, one Republican freeholder-elect, the freeholder director, two representatives of Speitel Associates and the county planner. Ibid.
The sole issue discussed at the December 10 and 11 meetings was the siting of the landfill in Gloucester County. Id. at 374, 510 A.2d 42. Three sites were discussed at the all-Democratic meeting, but two of them were only briefly mentioned. Ibid. Prior to the meetings Speitel Associates had made no recommendation regarding a site for the landfill. Ibid. On December 12 Speitel Associates issued its report and publicly recommended siting the landfill in South Harrison Township, the main site discussed at the December 10 meeting of the all-Democratic effective majority of the Board. Ibid. Also on December 10, the Solid Waste Advisory Council (SWAC) approved the South Harrison site and recommended it to the Board of Freeholders. Ibid. That night at the Freeholders regular meeting, it voted to adopt that recommendation and scheduled a public hearing on the proposed plan for December 27. Ibid.
Everyone agreed that the siting of the landfill in South Harrison Township was thoroughly discussed at the closed December 10 and December 11 meetings, which were held without notice to the public. Id. at 374-75, 510 A.2d 42. No one knew about the meetings until well after the public meeting was held on the siting of the landfill and a vote was taken. Id. at 375, 510 A.2d 42. In fact, the freeholders specifically told the public at the hearing "that the Board had `no knowledge of what site was going to be selected until, in fact, we were advised by Speitel Associates specifically the site selected the evening of [December 12] of the public [SWAC] presentation.'" Ibid.
We concluded that the December 10 and 11 meetings violated the OPMA and the violations were not cured by the public meetings because the public did not know about the prior meetings. Ibid. Important public business was discussed at those meetings and a strategy was mapped at the meetings, "particularly the December 10 meeting attended by the effective majority of the Board." Ibid. We held that "[e]ven though the purpose of a meeting is to discuss and not to vote on public business, the [OPMA] is applicable." Id. at 375-76, 510 A.2d 42. The December 10 meeting was attended by a majority of the Board to discuss specific public business that fell squarely within the scope of the "proclaimed legislative policy that important public discussions are to be held in the open." Id. at 376, 510 A.2d 42. We concluded that "these meetings [could not] by any stretch of imagination be called `typical partisan caucus meetings' or `chance encounters' exempted from the [OPMA]." Ibid. (citing N.J.S.A. 10:4-7); *72 see also In re Casino Simulcasting Special Fund, 398 N.J.Super. 7, 17, 939 A.2d 230 (App.Div.2008) (OPMA violated when deliberations conducted in private, even if vote and explanation are public).
This case is a far cry from the facts in South Harrison. There was no meeting at which a proposed ordinance was discussed prior to a vote on the ordinance. Neither the Township planner nor any expert in land use management attended the political caucus meetings to discuss either ordinance adopted in 2001. The two ordinances were not the sole topic of discussion. Rather, members of the Committee attending the political caucus meetings discussed only the political implications of plaintiff's project, its "importance" to the party in terms of votes, the political pulse of the residents of the Township and how to "spin" items of political importance in Middletown.
Members of the Committee as a group did not bring their Thursday agendas to the meetings in order to determine how to vote on agenda items at Monday Committee meetings. Instead, they met to determine their position as a political party on issues affecting Middletown and its residents. Although the all-Republican Committee left them in the "land of shadows between typical partisan caucuses and open public meetings," we are more than satisfied in this case that Committee members did not go beyond typical partisan caucuses.
Our conclusion that the political caucus meetings were exempt from the OPMA finds further support in the statutory definitions. The OPMA defines a "public body" as:
a commission, authority, board, council, committee or any other group of two or more persons organized under the laws of this State, and collectively empowered as a voting body to perform a public governmental function affecting the rights, duties, obligations, privileges, benefits, or other legal relations of any person. . . .
[N.J.S.A. 10:4-8(a).]
A "meeting" as defined by the OPMA means and includes any gathering . . . which is attended by, or open to, all of the members of a public body, held with the intent, on the part of the members of the body present, to discuss or act as a unit upon the specific public business of that body. Meeting does not mean or include any such gathering (1) attended by less than an effective majority of the members of a public body, or (2) attended by or open to all the members of three or more similar public bodies in a convention or similar gathering.
[N.J.S.A. 10:4-8(b).]
Finally, "public business" as defined by the OPMA "means and includes all matters [that] relate in any way, directly or indirectly, to the performance of the public body's functions or the conduct of business." N.J.S.A. 10:4-8(c).
However,
to be covered by the provisions of [the OPMA] a meeting must be open to all the public body's members, and the members present must intend to discuss or act on the public body's business; and therefore, typical partisan caucus meetings and chance encounters of members of public bodies are neither covered by the provisions of this act, nor are they intended to be so covered.
[N.J.S.A. 10:4-7 (emphasis added)]
Here, the group of Republicans that attended the political caucus meetings did not intend to discuss or act on the Township Committee's business. The trial court correctly concluded that the record demonstrated that the group met to discuss *73 the political ramifications of events that were occurring in Middletown. Plaintiff's project is an enormous one, which caused a large degree of controversy in the town. There were clearly political issues surrounding plaintiff's September 2000 application to the Zoning Board of Adjustment for a use variance.
Because of the importance of the project, the matter was discussed at the political caucus meetings, but the testimony in the record reflects that the group discussed what the project meant in terms of "votes." The group members did not discuss how they were going to vote, and did not predetermine their position on plaintiff's development project as the Township Committee but, rather, as a political party.
O'Grady, who had become ostracized, was specifically excluded from the political caucus meetings after April 2001 even though he was still a committee member when the 2002 ordinances were adopted. Thus, the political nature of the meetings was clear, and it is not surprising that the Republican Party would caucus regarding the largest and most politicized project in recent history in Middletown. The trial court concluded as much and it was correct.[9]
Affirmed.
NOTES
[1] Separate opinions are being issued in each of these four appeals.
[2] We have recently decided another appeal brought by Azzolina relating to one of his businesses in the Township. Circus Liquors, Inc. v. Governing Body of Middletown Twp., 398 N.J.Super. 220, 222, 941 A.2d 616 (App. Div.2008).
[3] This was four months prior to the adoption of the ordinance discussed in Mountain Hill I.
[4] Much of the evidence submitted at trial consisted of deposition testimony and documents. Only Brodsky, O'Grady and Cindy Ann Herrschaft testified at the trial.
[5] Brodsky's last term in office would have expired in January 2005 but he resigned in December 2003 after Mountain Hill II was decided and after the 2003 elections.
[6] O'Grady testified that in 2001, after he voted against the down-zone ordinance, he was no longer invited to the political caucus meetings. Smith testified that O'Grady was "ostracized" from the Committee because he "seemed pro development." However, he had also been involved in an effort to unseat Carton, which undoubtedly did not endear him to the others.
[7] In actuality there were three such ordinances. The third ordinance in 2004 is not discussed in this opinion because (1) it was adopted after this action was filed, (2) there is no direct evidence that it was discussed in any political caucus meeting and (3) it is the subject of one of the other appeals argued with this appeal on January 22, 2008.
[8] Of course, four members are required to adopt an ordinance. Mountain Hill I, supra, at 61, 801 A.2d 412.
[9] We also note that there is no credible way to connect the political caucus meetings in 2001 with the 2004 change of the PD zone to an adult active community (AAC) zone, which, based on the record, was not even considered in 2001. There is no evidence that an AAC zone was even considered by the Township Committee, let alone discussed at the political caucus meetings, in 2001. With no evidence of a private meeting at all in 2003 and 2004, plaintiff would certainly not be entitled to a declaration that the AAC zone ordinance was invalid.