**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3906-21

DIAMOND ELITE MERCHANT
SOLUTIONS, LLC,

     Plaintiff-Respondent,

v.

PAX TECHNOLOGIES,

     Defendant-Appellant.

_____

Submitted October 25, 2023 – Decided August 6, 2024

Before Judges Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. SC-000227-21.

Ehrlich, Petriello, Gudin, Plaza & Reed, PC, attorneys for appellant (John J. Petriello and Nathan Lam, on the brief).

Respondent has not filed a brief.

PER CURIAM

In this Special Civil Part case, defendant PAX Technologies, a point-of-sale software and hardware solutions provider, appeals from a July 5, 2022 judgment and award of $3,042 in favor of plaintiff Diamond Elite Merchant Solutions, LLC, an installer and servicer of credit-card terminals, following a bench trial on Diamond Elite's breach-of-contract claim[1] for damages related to an allegedly defective PAX credit-card terminal purchased and installed by Diamond Elite. Specifically, Diamond Elite sued PAX to recover $3,000[2] it had paid to reimburse a merchant who lost over $3,000 in revenue as a result of an alleged malfunction of the PAX credit-card terminal. The court found the parties had a contract and PAX liable for damages as a result of its breach of the contract. Because the court erred in finding plaintiff had proved a contract existed between the parties, we reverse and remand with instructions to enter a judgment in favor of defendant.

We discern the facts pertinent to our opinion from the trial record. PAX is a point-of-sale software and hardware solutions provider. Diamond Elite is

---

[1] In its complaint, Diamond Elite alleged only a breach-of-contract claim.

[2] At trial, the parties stipulated to damages in the amount of $3,000, although Diamond Elite had initially claimed damages in excess of $3,700, the amount Diamond Elite had credited to the merchant to cover its financial losses.

A-3906-21

an installer and servicer of credit-card terminals mostly for restaurants, retailers and wholesalers. Diamond Elite allegedly purchased the PAX terminal at issue from a third-party vendor and installed it for one of its clients, who ran a bagel shop.[3]

Following installation of the PAX terminal, the merchant had requested a modification of the PAX software on the credit-card terminal to remove the requirement that its customers sign transaction receipts for each purchase. A Diamond Elite employee contacted PAX Technical Support for instructions on how to remove the signature requirement. The instructions required that Diamond Elite's Chief Technology Officer, Jason Baker, access Diamond Elite's PAXSTORE reseller account to perform a "partial download into the device" that removed the signature component from the transaction process.[4]

---

[3] Neither party offered evidence information about Diamond Elite's purchase of the credit-card terminal. There was also no evidence establishing that PAX is the manufacturer of the credit-card terminal at issue or identifying the third-party seller who allegedly sold the terminal to Diamond Elite. In the complaint, Diamond Elite identifies the terminal as "[a] PAX terminal" and states the terminal "was purchased from, and provisioned by, PAX for one of Diamond Elite's customers."

[4] Neither Baker nor PAX's Vice President of Technical Services, Andy Jones, described the nature or terms of Diamond Elite's PAXSTORE reseller account or explained how Baker had gained access to it to update the software on the terminal.

A-3906-21

After the software update, the merchant notified Diamond Elite that certain credit-card transactions made by customers that initially appeared to have been "approved" at the time of sale had not been properly processed, resulting in more than $3,000 in lost revenue to the merchant. Diamond Elite reimbursed the merchant for its losses related to the incomplete processing of 862 credit card transactions. When PAX failed to properly advise Diamond Elite how to correct the issue and reimburse Diamond Elite the sum it had paid to cover the merchant's losses, this lawsuit claiming breach of contract ensued.

In its complaint against PAX, Diamond Elite alleged that PAX had failed to fix the issue with the terminal that had caused the transactions to show as approved when, in fact, they were not processed. Diamond Elite further asserted that the issue with the terminal had caused "$3,000 of credit card sales that were approved through the PAX terminal" to become "stuck in the device," and, although the terminal showed the merchant that the transactions had been approved, the transactions had not been processed.

At trial,[5] Diamond Elite's Chief Technology Officer, Baker, testified that his main responsibility was implementing point-of-sale equipment and

_____

[5] Prior to trial, PAX moved for dismissal of Diamond Elite's complaint under Rule 4:6-2(e) alleging: Diamond Elite's damages were "caused by [its] own

supporting various technology applications, including installing credit-card equipment and terminals. Baker installed the PAX terminal at issue in December 2020. He testified that the installation and download of PAX software onto the terminal went smoothly. Baker testified that the terminal at issue was a PAX terminal Model "S80" with which he was familiar because he had installed the same model and performed the same download of PAX's software onto a Model S80 terminal on prior occasions. Three days after the initial download, however, the merchant called to inquire whether Diamond Elite could remove all signature lines from all receipts, so that no transaction would require a signature.

According to Baker, he then contacted PAX for instructions on how to remove the signature line from the merchant's receipts, and PAX Technical Support staff responded with instructions via email. Baker testified that he followed PAX's instructions to implement the removal of the signature line and

---

actions" and Diamond Elite had "waived the right to hold PAX liable for any and all damages" based on the terms in PAX's End User License Agreement (EULA). The court denied the motion orally.

A-3906-21

at some point, the software prompted him to input an "authorization limit."[6] He stated, "we just wanted every receipt not to print a signature line. And, as I stated previously[,] we're normally used to just a feature that would (sic) turn it on or turn it off."

On cross examination, Baker testified that PAX had instructed he should set up Diamond Elite's own preferred authorization limit for the signature line, but that was not what he had sought to do. Based on PAX's instructions to remove the signature line, he was prompted to input an authorization limit to complete the update. He also testified that when he attempted to remove the signature line, it prompted an error message that prohibited him from removing the signature line without setting an authorization limit.

It is undisputed that Baker set the credit-card authorization limit at $5,000 when he updated the terminal settings for the purpose of eliminating the requirement that the merchant's customers sign a receipt for the relatively small transactions—clearly under the $5,000 limit requiring a signature—in the merchant's store. Baker explained that he had set the credit-card authorization

---

[6] Baker defined a credit-card authorization limit as "[a] threshold that you would set to not allow authorizations above a certain amount."

A-3906-21

limit at $5,000 because without inputting a limit, he could not complete the removal of the signature line from the transaction receipts.

When Baker implemented the partial download process to remove the signature line, he initially thought it was successful because the terminal was generating sale slips saying "approved." However, within days of the software change, the merchant advised Diamond Elite that the terminal was not working because although customer payments appeared to be approved, the funds were not being remitted to its account, resulting in lost revenue in excess of $3,000.

Baker contacted PAX Technical Support via email to advise PAX of the issue with the merchant's terminal, and Baker provided examples of receipts showing transactions that were approved and advised "[y]our device is spitting out the sales slip saying approved. How do we get all eight hundred and sixty two of these transactions out of there . . . ."[7] When asked at trial by Diamond Elite's counsel whether he had told PAX that the transactions were stuck, Baker responded "yes." Baker further testified that in addition to contacting PAX

---

[7] In another email message sent to PAX support, Baker stated "[f]irst data on rapid connector not seeing any authorizations at all so we're not able to force close anything. Yet it has transaction slips with approval codes dated back to [December 2021]. You guys need to better assist us here in getting this resolved."

Technical Support, he also had spoken with Willard Pedrozzo, a PAX Technical Support analyst, and Julius Ricar Tabilon, who was introduced to him as a PAX supervisor. Neither of them was able to resolve the issue.

Andy Jones, PAX's Vice President of Technical Services, testified as a witness for PAX. Jones testified that his responsibilities included "[o]verseeing most of the customer[] facing technical solutions teams within PAX" and that PAX support provided Diamond Elite with instructions "to change the signature line for transactions on [the] terminals." Jones also testified "there is a difference between the authorization limit and a signature limit" and explained that "[t]hose are two different features of a fast payment service . . . ."[8] He further testified that the signature limit is "a simple way to allow merchants to process transactions quickly without giving the transaction receipt over to the customer for them to sign it and hand back" and that the feature "[is] wrapped up into . . . fast[-]payment services." According to Jones, "[t]he other totally separate feature was the authorization limit, and that . . . dictates whether or not

---

[8] Throughout his testimony, Jones refers to the "signature line" feature using the term "signature limit." At trial, both parties used both terms interchangeably. We use both terms interchangeably because the terms refer to the same feature.

the terminal was online for an authorization or just approves it underneath that limit."

Jones also testified that the authorization limit is a feature that is set by the merchants, such as "a little sandwich shop or a fast food restaurant where the merchants are comfortable assuming a small amount of risk in order to gain efficiency to move the purchaser through the line quickly." Jones offered the following explanation:

> So take that bagel shop, a fast food restaurant, something like that, let's say assume they get a catering order for $300 if it were properly set at $200 or something like that or $50.00 that large transaction amount even for a small sandwich shop would, then, go online and get approval for those large transaction modes. So it still allows them the flexibility to move people through the line fast for low risk transactions, a small amount, but still gain authorization online and get actual approval for larger transactions if they come up.

On cross examination, Diamond Elite's counsel questioned why, in response to the request for instructions for removing the signature line, PAX Technical Support did not warn Diamond Elite's employee against setting the authorization limit at $5,000. Jones testified that Diamond Elite's request for instructions did not involve authorization limits and it would have been unnecessary for PAX's staff to communicate to Diamond Elite's employee that setting an authorization limit at $5,000 was not a recommended modification

A-3906-21

because "[t]he email didn't discuss authorization limits so there was no need for a warning." In response to a question posed by the court, Jones stated:

> when a merchant's profile is created they enter all that information, you know, their address, their headers, footers, everything that prints on the receipt . . . do they want to do contact list, do they want to do Apple Pay, do they want signature limits, . . . all that information is generally set up first before the terminal is deployed to the merchant. And, then, any changes they make can certainly be edited and redownloaded as well.

At the conclusion of the one-day bench trial, the court reserved decision and later issued an oral opinion. The court first addressed the issue of credibility and found Baker to be a credible witness and remarked on his experience and the fact that he had installed the PAX terminal at issue and later performed the software download to remove the signature-line feature. Although the court found PAX's witness, Jones, credible, the court remarked that he spoke in "generalities," referring to his testimony that it is usually up to the service provider, such as Diamond Elite, to set the authorization limit. The court concluded Jones was not "a witness that was involved in what actually occurred those days." The court also found significant that in Diamond Elite's communications with PAX, there was no discussion about authorization limits, what was advisable in terms of amounts, and that PAX had discussed only signature limits.

10

In addressing the issue of whether the parties had an enforceable contract and whether PAX's actions constituted a breach of the contract, the court concluded there was "clearly a contract between the parties in that Diamond Elite engaged the systems of PAX" and that "required them to provide . . . customer support." The court did not make any findings of fact supporting its determination there was a contract between the parties but instead, it found only that a contract existed "in that Diamond Elite engaged the systems of PAX," which required PAX to provide customer support in connection with its software services and credit-card terminal used by Diamond Elite's customers, and further that "the purpose of customer support is to assist the customer with respect to questions that arise with both the hardware as well as the software of their products."

The court also determined there was "clearly a breach . . . because, [it] believe[d], that the customer support was required to resolve the specific issue that was being presented by the customer" and that "it was incumbent upon the [PAX] to assist the customer by way of their contract to attempt to resolve the problem or at least address the problem specifically." It further concluded that PAX "further owed a duty to [Diamond Elite] to provide guidance in terms of what was not recommended." Lastly, the court found that it was the "lack of

11

customer support and lack of guidance" provided by PAX that had caused Diamond Elite's damages, stating:

> To date I have no way to know what happened. Was it a computer glitch? Was it an error in—in the inability of the system to download properly? [W]e are unsure because there is no testimony to that effect.
>
> Instead the testimony shows that the lack of customer support and lack of guidance provided by customer support to assist the plaintiff, caused the plaintiff damages. And, as I said, it was a breach of a contract and, therefore, caused the plaintiff the damages that the plaintiff incurred by having to reimburse their merchant in the amount of $3,000 which should have never occurred.

The court entered judgment for plaintiff for $3,000. This appeal followed.

I.

PAX argues the court erred in finding the parties had an enforceable contract and that PAX had breached a duty to Diamond Elite by failing to provide adequate instructions on setting an authorization limit and failing to appropriately remedy the issue once it had been advised that following Diamond Elite's removal of the signature line, PAX's software caused the improper failure to approve and process 862 credit card transactions. PAX further repeats its argument, which was rejected by the trial court prior to trial, that Diamond Elite should have been bound by the terms of its EULA, although PAX admits that it

did not produce evidence that Diamond Elite had signed or accepted the EULA. Additionally, PAX argues the court erred in finding a breach of contract because it had provided Baker with instructions on how to remove the signature line from the credit-card transactions and that the court admitted it did not know what happened in this case.

Our review of a judgment entered following a bench trial is very limited. We apply a deferential standard of review. D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). When the trial judge acts as the fact finder in a bench trial, we "must accept the factual findings of" that trial judge, when such findings "are 'supported by sufficient credible evidence in the record.'" State v. Mohammed, 226 N.J. 71, 88 (2016) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). We will "'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

Moreover, "[d]eference is particularly appropriate when the court's findings depend on credibility evaluations made after a full opportunity to

observe witnesses testify, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and the court's 'feel of the case.'" Accounteks.Net, Inc. v. CKR L., LLP, 475 N.J. Super. 493, 503 (App. Div. 2023) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). For that reason, "[i]n reviewing the judge's findings, '[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence,'" 160 W. Broadway Assocs., LP v. 1 Memorial Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021) (second alteration in original) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)).

We "owe no deference to the judge's interpretation of the law and the legal consequences that flow from established facts." Ibid. "A trial court's interpretation of a contract is subject to de novo review." Accounteks.net, 475 N.J. Super. at 504.

II.

Applying these principles, we disagree with the court's determination there was "clearly a contract" between the parties based on PAX's provision of instructions and customer support to Diamond Elite. To be enforceable, a contract "must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors

14

v. Ryan, 128 N.J. 427, 435 (1992) (quoting West Caldwell v. Caldwell, 26 N.J. 9, 24-25 (1958)) (explaining "if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract."). See also Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (quoting Model Jury Charge (Civil), 4.10A, "The Contract Claim—Generally" (approved May 1998)) (explaining it is plaintiff's burden to prove four elements, by a preponderance of the evidence, to sustain a breach of contract claim: (1) a contract containing certain terms; (2) that plaintiff did what the contract required it to do; (3) that defendant did not do what the contract required it to do, defined as a breach of the contract; and (4) damages flowing therefrom).

Here, the court did not address the fundamental elements of a contract—mutual assent, offer, acceptance, and consideration, ibid., and made no findings regarding any of those elements or the essential terms of the purported contract supporting its decision. As PAX correctly argues, the court also did not address whether Diamond Elite had satisfied its burden of proof, by a preponderance of the evidence, that there was a contract, and a subsequent breach thereof.

The court concomitantly failed to address the essential elements of a contract such that we can discern the legal basis on which the court's finding of a binding contract is based. The decision appears to be based on the assumption

of the existence of a contract and an assumption about what its terms would be rather than evidence of an actual contract and its terms. But decisions are made based on the evidence presented, not assumptions.

At trial, plaintiff's witness Baker testified that to remove the signature line from the merchant's terminal as requested, he downloaded PAX's software onto the terminal, solicited assistance from PAX Technical Support and used the instructions provided to modify the signature line requirement. And, when he was informed by the merchant that no funds were flowing into its account even though the transactions were showing as approved, he again contacted PAX's support and advised them that the transactions appeared to be "stuck," and PAX was unable to resolve the issue. Baker, however, did not testify about any agreement on the part of PAX to remedy any issues with the merchant's terminal, explain on what basis he claimed there was a contract between Diamond Elite and PAX, or any agreement between PAX and the merchant directly.

In fact, there was no testimony about any agreement or contract between the parties, only that PAX had provided instructions on how to remove the signature line from its terminal and those instructions did not work. At trial, the court correctly pointed out, "it had no way of knowing what happened in the case." Nevertheless, the court concluded there was a contract. In the absence

of evidence of an agreement precisely defining "sufficiently definite" terms such that "the performance to be rendered by each party can be ascertained with reasonable certainty," see Weichert, 128 N.J. at 435, there can be no contract.

Because we discern insufficient support in the record for the court's ruling there was an enforceable contract between the parties, we need not reach PAX's argument concerning applicability of the EULA. We therefore reverse the judgment entered in favor of Diamond Elite and remand with instructions to enter judgment in favor of PAX.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3906-21