# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2471-17T4

SAMUEL K. BURLUM,

    Plaintiff-Appellant,

v.

NERMIN UCAR,

    Defendant-Respondent.

_____

Argued telephonically May 4, 2020 –
Decided May 19, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Sussex County,
Docket No. FM-19-0035-15.

Janet S. Del Gaizo argued the cause for appellant.

Thomas Joseph DeCataldo, Jr. argued the cause for
respondent (Skoloff & Wolfe, P.C., attorneys; Thomas
Joseph DeCataldo, Jr., on the brief).

PER CURIAM

Plaintiff appeals from a December 19, 2017 amended dual judgment of divorce (AJOD) and multiple other orders entered by different family part judges.[1]  Judge Noah Franzblau issued the AJOD after conducting an eleven-day trial.  The judge made extensive findings and conclusions of law, which appear in his eighty-four-page written decision, with which we substantially agree.  We therefore affirm.

On appeal, plaintiff argues:

> POINT I
>
> WHEN CUSTODY OF DIVORCED OR SEPARATED PARENTS IS AT ISSUE, "THE RIGHTS OF BOTH PARENTS SHALL BE EQUAL[,]" N.J.S.A. 9:2-4.2[.]
>
> POINT II
>
> THE TRIAL JUDGE ERRED WHEN HE DECLARED . . . PLAINTIFF AN UNFIT PARENT WITHOUT MAKING ANY FINDINGS THAT HIS CONDUCT HAS A SUBSTANTIAL ADVERSE EFFECT ON THE CHILD[,] N.J.S.A. 9:2-4.4(C)[.]
>
> POINT III
>
> THE TRIAL JUDGE FAILED TO ADEQUATELY PROTECT THE CHILD'S BEST INTERESTS WHEN HE REFUSED TO PERMIT PLAINTIFF TO CALL

---

[1]  These orders include:  seven paragraphs of a January 23, 2015 order; three paragraphs of a February 13, 2015 order; one paragraph of an October 28, 2016 order; two paragraphs of a December 16, 2016 order; three paragraphs of a May 12, 2017 order; and, on a limited remand, a December 19, 2018 order.

2

WITNESSES FROM [THE DIVISION OF CHILD PROTECTION AND PERMANENCY (DCPP)] TO TESTIFY, AND FAILED TO ADMIT THE [DCPP] REPORT INTO EVIDENCE[.]

POINT IV

THE FIRST JUDGE'S CREDIBILITY FINDINGS, BASED ONLY ON CONFLICTING MOTION PAPERS AND HIS GUT FEELING, UNFAIRLY PREJUDICED . . . PLAINTIFF THROUGHOUT THE ENTIRETY OF THE LITGATION, INCLUDING THE FINAL DECISION[.]

POINT V

A CHILD'S BEST INTERESTS ARE NOT ADEQUATELY REPRESENTED WHERE HE HAS NO LEGAL COUNSEL, A PARTY APPEARS PRO SE, AND THE ISSUE UNDER REVIEW IMPACTS THE BEST INTERESTS OF THE CHILD[.]

POINT VI

THE SECOND JUDGE COMMITTED HARMFUL ERROR WHEN HE ALLOWED . . . DEFENDANT TO MOVE FROM SUSSEX COUNTY TO BERGEN COUNTY WITH THE INFANT CHILD, PROVIDING DEFENDANT WITH DE FACTO LEGAL AND RESIDENTIAL CUSTODY, AND IRREPARABLY CHANGING THE MARITAL STATUS QUO[.]

POINT VII

THE TRIAL JUDGE'S FAILURE TO RETROACTIVELY ADJUST PLAINTIFF'S PENDENTE LITE SUPPORT IS IN CONFLICT WITH

HIS FINDINGS OF FACT RELATIVE TO THE
MARITAL LIFESTYLE[.]

POINT VIII

THE TRIAL [JUDGE'S] LEGAL FEE AWARD OF
$60,000 TO DEFENDANT IS DUPLICATIVE,
PUNITIVE IN NATURE, AND SO FAR EXCEEDS
PLAINTIFF'S ABILITY TO PAY THAT IT MUST BE
REVERSED[.]

In his reply brief, plaintiff makes the following additional contentions, which

we have re-numbered:

POINT IX

THE RECORD IS DEVOID OF THE TYPE OF
EVIDENCE REQUIRED TO SUPPORT AN
UNFITNESS DECLARATION[.]

POINT X

THE TRIAL [JUDGE] ERRED BY DISREGARDING
CREDIBLE EVIDENCE SHOWING THAT
DEFENDANT IS INTENTIONALLY AND
WILLFULLY TRYING TO DISAFFECT . . .
PLAINTIFF AND [THE] CHILD[.]

POINT XI

THE TRIAL [JUDGE'S] FAILURE TO CONSIDER
EVIDENCE ESSENTIAL TO THE CHILD'S BEST
INTEREST[S] DEMANDS A REMAND[.]

4

POINT XII

PLAINTIFF WAS UNFAIRLY PREJUDICED BY THE FIRST JUDGE'S IMPROPERLY MADE CREDIBILITY FINDINGS SUCH THAT HE WAS TREATED UNFAIRLY AND INEQUITABLY, RESULTING IN THE [JUDGE'S] FAILURE TO PROPERLY ENSURE THAT THE CHILD'S BEST INTERESTS ARE PROTECTED[.]

POINT XIII

WHAT IF PLAINTIFF'S "CONSPIRACY THEORIES" ARE NOT THEORIES AT ALL?

In our review of a non-jury trial, we defer to a trial judge's factfinding "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). We also note proper factfinding in divorce litigation involves the Family Part's "special jurisdiction and expertise in family matters," which often requires the exercise of reasoned discretion. Id. at 413. In our review, "[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, L.L.C v. Township of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (alteration in original) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). Consequently, when this court concludes there is satisfactory evidentiary support for the trial judge's findings, "its task is complete[,] and it should not disturb the result." Beck v.

<u>Beck</u>, 86 N.J. 480, 496 (1981) (quoting <u>State v. Johnson</u>, 42 N.J. 146, 162 (1964)).

In bench trials, like here, our "[d]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" <u>Cesare</u>, 154 N.J. at 412 (quoting <u>In re Return of Weapons to J.W.D.</u>, 149 N.J. 108, 117 (1997)). We recognize a trial judge who observes witnesses and listens to their testimony, develops "a 'feel of the case,'" <u>N.J. Div. of Youth & Family Servs. v. E.P.</u>, 196 N.J. 88, 104 (2008) (quoting <u>N.J. Div. of Youth & Family Servs. v. M.M.</u>, 189 N.J. 261, 293 (2007)), and is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand." <u>Ibid.</u> In contrast, review of the cold record on appeal "can never adequately convey the actual happenings in a courtroom." <u>N.J. Div. of Youth & Family Servs. v. F.M.</u>, 211 N.J. 420, 448 (2012).

Judge Franzblau made extensive credibility findings. He found defendant credible in all material respects. But, he found plaintiff "incredible." He reached that independent determination—which was the same finding made by an earlier judge—after an eleven-day trial and a detailed review of the testimony. He found plaintiff's statements "def[ied] truth, logic, and any objective interpretation of the facts." According to the judge, plaintiff was

6

"unable to provide adequate or reasonable explanations for his conduct and/or statements." Although there are additional examples in the record supporting his findings, the judge outlined nine separate reasons "only as a sample to demonstrate the basis for . . . finding that [p]laintiff [was] not credible."

Contrary to plaintiff's contention, the judge did not make an erroneous custody determination. Applying N.J.S.A. 9:2-4, the judge concluded that it would be in the best interests of the child to award defendant sole legal and physical custody. In his written decision, the judge found that statute factors one, two, three, four, seven, eight, ten, twelve, and thirteen weighed in favor of awarding defendant custody, and that none of the factors weighed in plaintiff's favor. In reaching that conclusion, the judge emphasized the importance of plaintiff's lack of credibility, "his demonstrated lack of stability, the parties' inability to agree[,] . . . [p]laintiff's untenable positions that prevented compromise, [his] persistent failure to acknowledge fathering another child, and concerns regarding [p]laintiff's general fitness." The judge did not make summary conclusions, but rather he pointed to evidence adduced at trial to support his findings.

Plaintiff argues, however, that the judge did not treat his parental rights in parity with those of defendant, resulting in an erroneous custody determination.

Along those lines, he argues that: (1) he was operating at a disadvantage during this entire matter due to the judge's bias against him; (2) his capacity to demonstrate his ability to care for the child was hampered by a presumption that he was an unfit parent who was entitled to only limited parenting time; and (3) his efforts to improve himself and create a stable home for the child were dismissed out-of-hand.

Plaintiff is correct that "[i]n any proceeding involving the custody of a minor child, the rights of both parents shall be equal[.]" N.J.S.A. 9:2-4. However, the record supports the various rulings during the pendency of the litigation that limited the child's exposure to plaintiff, especially given plaintiff's behavior and lifestyle. The judge's findings of fact, which we need not detail here, are indeed supported by the record. Contrary to plaintiff's contention, the judge did not reach an erroneous custody determination.

Plaintiff argues that the judge erroneously declared him unfit without finding that his conduct caused a substantial adverse effect on the child. He also asserts that the judge erred by failing to provide him with a "pathway" back to joint legal custody or guidance for increasing his parenting time. Plaintiff is correct that "[a] parent shall not be deemed unfit unless the parent['s] conduct has a substantial adverse effect on the child." N.J.S.A. 9:2-4(c). But the record

supports the judge's findings and conclusions that plaintiff negatively affected the child.

For example, the record demonstrates that plaintiff: (1) failed to spend consistent time with the child in the marital home both before and after the parties decided to divorce; (2) failed to pay child support; (3) continued working at Extreme Energy Solutions (EES) for the better part of a decade without drawing any part of the $250,000 salary to which he was entitled under EES documents; (4) committed fraudulent conduct that had resulted in the imposition of a $1,100,000 fine and other outstanding debts[2]; (5) engaged in a pattern of manipulative and deceitful behavior as to his available monies, residence, marital status and fatherhood; (6) lied about his dealings with defendant during the pendency of this case; (7) pursued extramarital affairs, offered monies to his paramours; (8) did not serve as an appropriate role model; (9) treated defendant with open hostility while in the child's presence; (10) failed to secure a residence

---

[2] In In re Burlum, No. A-3316-17 (App. Div. Sept. 20, 2019) (slip op. at 8-9), we upheld a January 18, 2018 Final Decision by the Chief of the New Jersey Bureau of Securities (the Bureau Chief) concluding that plaintiff and EES violated the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 to -83. The Bureau Chief determined that they violated the law by "selling unregistered securities, acting as an unregistered agent, employing unregistered agents, and making untrue statements of material facts and omitting material facts necessary in order to make the statements they made not misleading." Id. at 1. The Bureau Chief imposed $1,125,000 in penalties.

that he was financially capable of maintaining; and (10) displayed a general lack of trustworthiness. Thus, as to plaintiff's purported path towards self-improvement and increased role in the child's life, under the facts of this case, the record reveals the opposite and instead supports the judge's findings.

Plaintiff contends that the judge erred by refusing to admit DCPP's report, pertinent to allegations that plaintiff had abused the child, and by refusing to permit plaintiff to call DCPP witnesses regarding those allegations. We see no abuse of discretion as to either evidentiary ruling. In his final decision, the judge stated:

> Defendant made several complaints to [DCPP] expressing concerns about injuries sustained by [the child], sexualized behaviors, and general concern for [the child's] safety with [p]laintiff. Ultimately, [DCPP] determined [d]efendant's allegations to be unfounded. During trial, [d]efendant stipulated to [DCPP's] conclusions. As a result, this [c]ourt precluded [p]laintiff from introducing [DCPP's] confidential reports and associated documents and from calling [DCPP] investigators as witnesses. While [p]laintiff continued to assert that [DCPP] materials would establish that [d]efendant was making false allegations to obtain custody, [p]laintiff made no proffer with respect to any [DCPP] document that reached that conclusion. As a result, this [c]ourt determined that the interest in maintaining the confidentiality of the [DCPP] documents outweighed any justification for their release and/or publication during trial. Further, as noted by Dr. Fridman, "[i]t seemed to me that [defendant] was not using the term physical abuse,

> appropriately perhaps because English is her second language and I pointed out to her that the example she had just given would be a question of [plaintiff] considering putting [the child] in a situation which might be physically dangerous. This was not the common use of the term physical abuse . . . . [Defendant] said okay and agreed to this distinction[.]" Given the circumstances, this [c]ourt found no justification for the use of the [DCPP] documents or to call [the DCPP] witnesses during trial.

Plaintiff now argues that the judge failed to protect the child's best interests and safety when it refused to permit plaintiff to present testimony from DCPP investigators and admit DCPP's file. Plaintiff insists that: (1) the file was replete with relevant information; (2) the reports in the file and the testimony from the DCPP witnesses would have revealed that defendant intentionally made videos of the child exhibiting sexualized behavior in order to "induce" a referral to DCPP in an effort to sever plaintiff's relationship with the child, and that in doing so defendant harmed the child; (3) defendant acknowledged the relevance of the DCPP file when she asked the judge to release it during discovery; and (4) the DCPP file was the only unbiased evidence "available in this case that focuse[d] solely on the child's welfare."

Although defendant sought the file's disclosure during discovery, which the judge granted because of the possibility it contained crucial information, this did not establish its admissibility at trial. As defendant notes, the rules

11

pertaining to discovery are far broader than evidence rules at trial. Moreover, once DCPP found the abuse allegations were unfounded, the DCPP file had no relevancy at trial. Contrary to plaintiff's representations, he did not make a satisfactory proffer regarding the usefulness of the file. Although he claimed that the materials in the file would show that defendant intentionally made false allegations against him and harmed the child in the process, he did not identify any document containing these conclusions. He had no answer when asked how the DCPP witnesses could testify to defendant's intent. He also admitted at trial that he had not made an allegation to DCPP that defendant harmed the child.

Moreover, plaintiff's claim that the DCPP's file was the only unbiased evidence addressing the child's best interests is inaccurate. The judge had the benefit of the reports prepared by Dr. Dennis Shaning and Dr. Morton Fridman, as well as their trial testimony. Although plaintiff suggests that these reports were useless because they were tainted by a prior judge's credibility findings in January 2015, the trial judge found that the doctors properly based their conclusions upon their expertise.

Plaintiff contends that the judge improperly required him to pay half of the costs of the marital home pending its sale, authorized the sale of the marital home, and permitted defendant to move to another county with the child.

Plaintiff concedes trial judges have discretionary authority to order the sale of marital assets pendente lite when "fit, reasonable, and just." Randazzo v. Randazzo, 184 N.J. 101, 114 (2005). He insists, however, that by allowing the home to be put on the market in January 2015, the judge rendered an improper de facto pendente lite custodial decision, which paved the way for defendant to relocate with, and deny plaintiff access to, the child. According to plaintiff, the judge's subsequent order, which did in fact permit defendant to move prior to trial, "forever alter[ed] the pendente lite status quo[] and provid[ed] [d]efendant with de facto custody to . . . [p]laintiff's exclusion." We see no abuse of discretion here.

Plaintiff ignores that: (1) he twice agreed to sell the marital home and then reneged; (2) the parties could not afford to live in that home without plaintiff making a steady financial contribution; (3) both Dr. Shaning and Dr. Fridman agreed that plaintiff had a narcissistic/sociopathic personality and was unreliable and unstable in all aspects of his life, and the judge had the benefit of these expert opinions when he permitted defendant to relocate; (4) he harmed the child by his absenteeism and disinterest after the child was born; (5) he had two years to obtain stable housing and employment and failed to do so; and (6) defendant demonstrated her ability to care for the child and that she needed to

13

be closer to New York to get her business functional so that she could provide for the child. Plainly, the judge's decisions were made not to harm plaintiff, but to ensure that a responsible individual cared for the child.

Plaintiff also contends that the trial judge improperly altered the status quo pendente lite by requiring him to financially contribute towards the marital home. Although plaintiff insists that defendant had voluntarily agreed to "support[] the family," defendant drew upon her premarital assets to pay the bills out of necessity after plaintiff's financial duplicity became apparent. Plaintiff admitted he knew that the home was beyond their means at the time they bought it and confirmed that he contributed some funds to assist with carrying costs. Moreover, plaintiff agreed in November 2014 to give defendant $2200 per month to assist with the bills for the home in which he continued to reside. The judge did not alter the status quo by mandating a payment of $2500.

We reject plaintiff's contention that the judge abused his discretion by declining to retroactively adjust his support arrears. He contends the support orders that obligated him to pay half of the marital home's carrying costs pending its sale were not in accordance with the parties' marital lifestyle because their lifestyle revealed defendant was responsible for all marital expenses. The judge

14

found that the sole evidence of the parties' marital lifestyle was their expensive

home, which required defendant use her savings to maintain. He stated:

> Defendant attempted to implement a standard of living that was consistent with her premarital standard of living. This [c]ourt finds that [d]efendant's standard of living was premised on [p]laintiff's representation that she would no longer have to work following EES's impending initial public offering and [p]laintiff taking [a] salary. When EES and [p]laintiff became immersed in the [Bureau] litigation and [p]laintiff continued to forfeit his salary, the marital lifestyle implemented by [d]efendant could not be maintained. The marital lifestyle essentially entailed owning and maintaining a luxury home. Unfortunately, since [d]efendant had shuttered her business to move to Sussex County, and [p]laintiff did not draw [a] salary from EES and EES did not complete the initial public securities offering, [d]efendant had to contribute pre-marital assets to maintain the marital lifestyle, including specifically the marital residence until it could be sold. Aside from the home, the parties did not live extravagantly. There was no evidence presented that the parties dined out, traveled or vacationed, purchased any luxury items or shopped for anything other than necessities.

The judge addressed plaintiff's contention as to the pendente lite award in

defendant's favor. The judge rejected plaintiff's argument that he incorrectly

attributed him an annual income of $250,000. The judge noted that plaintiff had

agreed to "forfeit" salaries, commissions, bonuses and benefits worth $250,000

per year from 2009 through 2012, in favor of receiving 10,000,000 shares of

EES stock. The judge found that plaintiff inadequately explained his failure to

receive any salary from EES, emphasizing that plaintiff: (1) did not demonstrate that he asked the EES board for a salary and was denied; (2) did not provide any financials indicating that EES could not afford to pay him a salary; (3) had been touted as invaluable to EES; and (4) offered no explanation as to why EES, by contrast, was willing to pay a salary of $40,000 to an employee who lacked industry experience. The judge concluded that "it would appear that [p]laintiff's receipt of no annual salary has been a strategic decision potentially made by [p]laintiff to limit his financial obligation to [d]efendant . . . and that [p]laintiff has been able to secure financial resources through other means that are beyond [d]efendant's reach."

The judge also observed that plaintiff failed to provide any evidence that he sought other employment opportunities. Moreover, he questioned plaintiff's financial representations, noting that plaintiff: (1) failed to disclose his receipt of $102,934 from IMobile on January 10, 2015; (2) failed to identify the source of the $10,000 he claimed he earned from his LGBT article; and (3) managed to provide other women with money to cover their living expenses and pay for a sex machine. In sum, the judge concluded:

> Plaintiff's claim in support of his limited earning capacity is contradicted by his own representation of his value to EES, EES's board members' acknowledgment of [p]laintiff's value to EES as well as

by [p]laintiff's entrepreneurial skills and his consistent access to funds, which access has allowed [p]laintiff to buy a home and support other women and personal endeavors. For the foregoing reasons, this [c]ourt finds the imputation of $250,000 of annual income to [p]laintiff to be reasonable both retroactively and prospectively.

Although plaintiff now renews his position that the pendente lite support orders do not comport with the marital lifestyle, no retroactive adjustment was warranted. Contrary to plaintiff's representations, the "marital lifestyle" here consisted of defendant <u>involuntarily</u> paying the parties' household bills with her premarital assets out of necessity because plaintiff's representations as to his impending wealth were entirely false. Moreover, plaintiff ignores that he offered to pay defendant $2200 per month starting in November 2014, which was only $300 less than the court-ordered monthly payment that he failed to pay.

Plaintiff contends that the judge abused his discretion by awarding defendant $60,000 in counsel fees. The award of counsel fees and costs in a matrimonial action rests in the trial judge's discretion. <u>R.</u> 5:3-5(c); <u>Eaton v. Grau</u>, 368 N.J. Super. 215, 225 (App. Div. 2004); <u>Guglielmo v. Guglielmo</u>, 253 N.J. Super. 531, 554-55 (App. Div. 1992). In deciding whether to make such an award, the judge should consider

(1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

[R. 5:3-5(c).]

Success in the litigation of the parties' dispute is not a prerequisite for an award of counsel fees. Kingsdorf v. Kingsdorf, 351 N.J. Super. 144, 158 (App. Div. 2002); Guglielmo, 253 N.J. Super. at 545. Also, where one party acts in bad faith, the parties' relative economic positions are of little relevance because the fee award is then intended "to protect the innocent party from unnecessary costs and to punish the guilty party." Yueh v. Yueh, 329 N.J. Super. 447, 461 (App. Div. 2000).

The court in Kelly v. Kelly, 262 N.J. Super. 303 (Ch. Div. 1992), discussed the issue of counsel fees in matrimonial cases.

Fees in family actions are normally awarded to permit parties with unequal financial positions to litigate (in good faith) on an equal footing. With the addition of bad faith as a consideration, it is also apparent that fees may be used to prevent a maliciously motivated party from inflicting economic damage on an opposing party

> by forcing expenditures for counsel fees. This purpose has a dual character since it sanctions a maliciously motivated position and indemnifies the "innocent" party from economic harm.
>
> [Id. at 307 (citations omitted).]

The Kelly court defined bad faith as intentionally misleading or deceiving another, thereby precipitating legal action, and noted that more than a simple mistake was required before a party would be found guilty of bad faith. Ibid.; accord Von Pein v. Von Pein, 268 N.J. Super. 7, 19-20 (App. Div. 1993). Other examples of bad faith include misusing or abusing the court process, seeking relief not supported by fact or law, intentionally misrepresenting facts or law, or otherwise engaging in vexatious acts for oppressive reasons. Borzillo v. Borzillo, 259 N.J. Super. 286, 293-94 (Ch. Div. 1992).

According to Rule 1:7-4(a), a judge in a non-jury trial and on motion must "by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law." "[F]ailure to perform the fact[]finding duty 'constitutes a disservice to the litigants, the attorneys and the appellate court.'" Chambon v. Chambon, 238 N.J. Super. 225, 231-32 (App. Div. 1990) (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)). When a trial judge fails to set forth the reasons for his or her opinion, meaningful appellate review is inhibited. Id. at 232. The absence of adequate findings will generally warrant a reversal

19

of the trial judge's decision. Gordon v. Rozenwald, 380 N.J. Super. 55, 79 (App. Div. 2005); Clarke v. Clarke ex rel. Costine, 359 N.J. Super. 562, 572 (App. Div. 2003); Heinl v. Heinl, 287 N.J. Super. 337, 347 (App. Div. 1996).

In awarding counsel fees to defendant, the judge first found that, while defendant demonstrated that her liabilities exceeded her assets, plaintiff's net worth could not be ascertained based upon the information he provided.

Next, the judge noted that although defendant paid $263,855 towards her outstanding fees by depleting her pre-marital savings and by borrowing funds from her business' defined benefit plan and other third parties, she still owed more than $40,000 to her counsel. Plaintiff, by contrast, did not owe monies to counsel. Although plaintiff's financial circumstances were unclear, the judge was satisfied that—as evidenced by his demonstrated ability to raise funds for his housing and lifestyle, such as his support of other women and acquisition of a sex machine—plaintiff had the ability to contribute towards defendant's fees. Next, the judge found that while the parties' positions regarding custody and child support were advanced in good faith, plaintiff's claim for alimony was not. He also noted that defendant was awarded counsel fees on five prior occasions totaling $14,640, of which plaintiff had only paid $2000.

In considering the results obtained, the judge observed that defendant was successful in her pursuit of custody and in her opposition to plaintiff's requests for custody, child support, and alimony. She had not, however, prevailed in her requests for the judge to allocate a portion of her home equity loss to plaintiff and to require plaintiff to reimburse her for the depletion of her marital assets and the other debts she had incurred to support the family and marital home. As to plaintiff, he was not only unsuccessful in the claims noted above, but he failed to identify any assets subject to equitable distribution to which he was entitlement.

Finally, the judge found that plaintiff's questionable conduct during litigation greatly contributed towards defendant's counsel fees. In particular, he faulted plaintiff for: (1) refusing to attend his deposition until plaintiff secured a court order; (2) unjustifiably refusing to answer questions pertaining to EES's structure and financial condition and also the existence of his second son in Wisconsin during his deposition and at trial; (3) refusing to pay pendente lite support and counsel fees in violation of numerous court orders; (4) filing motions to obtain Judge Farber's oath of office and bond and also to compel the appearance of out-of-state witnesses with invalid subpoenas; (5) filing repeated motions on the same issue; (6) his inability to confirm, during cross-

examination, that he had always been truthful with the court; (7) making false accusations about defendant's failure to include him in the selection of the child's school, as well as false assertions that he served as the child's primary custodian when defendant's mother returned to Turkey for several months; (8) reneging on his initial agreement to sell the marital house and thereby forcing defendant to file multiple motions; and (9) falsely claiming that defendant had interfered with his ability to attend Dr. Shaning's deposition.

In sum, the judge concluded:

> In the context of [d]efendant's fee request, this [c]ourt finds that the attorney['s] fees charged by [d]efendant's attorneys are reasonable . . . especially based upon the contentiousness at every juncture. . . . However, recognizing that many, but not all, tasks would have had to be performed by [d]efendant regardless of [p]laintiff's questionable litigation conduct (e.g. deposing [p]laintiff, preparing a pendente lite motion, participating in discovery, and preparing a trial brief), and the fact that the [c]ourt found that the custody issue was pursued by both parties in good faith, this [c]ourt awards fees to [d]efendant only in [the] amount that this [c]ourt believes [was] incurred as a result of [p]laintiff's questionable tactics. On this basis, this [c]ourt orders that [p]laintiff reimburse [d]efendant for $60,000 of her attorney['s] fees.

Plaintiff now contends that the judge's counsel fee award must be reversed because: (1) it was duplicative, as plaintiff had already been ordered to pay $14,640 for his bad faith conduct during this case; (2) it was punitive in nature;

and (3) it exceeded his ability to pay. Contrary to plaintiff's representation, the award is not duplicative because plaintiff only paid $2000 towards those earlier fee awards. As such, the judge included the remaining $12,640 in his final $60,000 award. In support of his final award, the judge set forth other examples of plaintiff's untoward conduct apart from the matters that gave rise to the earlier awards.

Moreover, the judge thoroughly considered the plaintiff's economic situation, and his findings should not be disturbed based upon plaintiff's self-serving, unsubstantiated claims that he cannot afford to pay the fee award. As defendant points out, plaintiff managed to fund this appeal, thereby confirming the judge's finding that he has access to monies.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2471-17T4