775 A.2d 671

HOME PROPERTIES OF NEW YORK, L.P., PLAINTIFF–
RESPONDENT/CROSS–APPELLANT, v. OCINO, INC.,
DEFENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted May 1, 2001—Decided July 2, 2001.

Before Judges SKILLMAN, CONLEY and LESEMANN.

*Fox & Gemma*, attorneys for appellant/cross-respondent (*Gary E. Fox* and *Anthony P. LaMantia*, on the brief).

*Flaster/Greenberg*, attorneys for respondent/cross-appellant (*Carl S. Bisgaier* and *Sharon A. Morgenroth*, on the brief).

The opinion of the court was delivered by

LESEMANN, J.A.D.

Defendant Ocino, Inc. (Ocino) appeals from a Law Division judgment declaring that it has no further contractual interest in a parcel of real property in Middletown Township. The property

had been owned by Frank A. Vaccaro (Vaccaro) who contracted to sell it to Ocino, with the expectation that it would be developed—at least in part—for Mt. Laurel affordable housing. Vaccaro subsequently sold his interest in the property to plaintiff Home Properties of New York, L.P. (Home), subject to the preexisting contract with Ocino. Closing was delayed for various reasons referred to below, and ultimately Home served a time of the essence notice on Ocino. Following a trial, the Law Division held that by its actions after serving the notice, Home had waived its right to proceed under the time of the essence notice. However, the court then held that Ocino had nevertheless failed to close within a reasonable time and on that basis, it declared Ocino's rights terminated and entered judgment in favor of Home.

We conclude that Home's time of the essence notice was reasonable and lawful and that it did not thereafter waive its right to proceed thereunder. Consequently, when Ocino failed to close in conformity with that notice, Home acted properly in declaring the contract terminated and was entitled to a judgment declaring Ocino's interest in the property terminated. We thus reach the same ultimate conclusion as the Law Division, albeit by a different route, and thus we affirm.[1]

The facts of the case involve some arcane points within the maze which sometimes seems to characterize the world of affordable housing, the functions of the Council on Affordable Housing (COAH), so-called tax credit construction financing, and the interplay of those concepts with traditional planning board and municipal site plan approval. For purposes of this appeal, however, we need not delve too deeply into those details. The essential facts,

---

[1] After defendant Ocino filed its appeal from the trial court's judgment in favor of plaintiff Home, Home filed what it termed a cross-appeal. The "cross-appeal" expressed disagreement with the trial court's reasoning that found Home had "waived" the right to enforce its time of the essence notice. However since, notwithstanding that reasoning the trial court rendered judgment in favor of Home, there is no basis or need for an appeal by Home, and accordingly the cross-appeal is dismissed. *See State v. Guzman,* 313 *N.J.Super.* 363, 371–72, 712 *A.2d* 1233 n. 1 (App.Div.), *certif. denied,* 156 *N.J.* 424, 719 A.2d 1022 (1998).

as they affect and determine the rights of the parties, can be set out relatively simply.

In 1993, Vaccaro submitted to the Middletown Planning Board a site plan to construct 400 units of affordable senior housing on 23.5 acres of land known as Lots 1.01, 2 and 3.01 in Block 1490 in Middletown. Objections were raised by the Borough of Atlantic Highlands, which abutted the property, but after the Borough filed a complaint in lieu of prerogative writs, the matter was settled in 1994 by an agreement under which the number of senior housing units was reduced from 400 to 375. In May 1994, COAH approved the plan, which provided that of the 375 senior units, 281 were to be priced at market value, 47 were to be reserved for low income occupants and 47 for moderate income persons.

In October 1996, Vaccaro contracted to sell the property to Ocino. In April 1997, the Middletown Planning Board, and thereafter the municipal governing body, approved a development plan for the property which provided that all the units were to be "affordable housing," rather than the twenty-five percent called for by the prior settlement agreement. Further, that 1997 plan included an additional ninety-two units of "assisted living housing," and raised an issue as to whether those additional units had been contemplated within the 1994 settlement.

As a result of what it saw as an inconsistency between the prior settlement and the later municipal approval, COAH disapproved the latter and thereafter the Law Division set aside the municipal approvals for the same reason. That determination was appealed to this court and, while the litigation that led to this appeal was proceeding through the trial court, that appeal respecting the municipal approvals remained pending.

On February 18, 1998, Home bought the property from Vaccaro, subject to the existing contract between Vaccaro and Ocino. Before proceeding to the crux of this case—the time of the essence letter which Home served on Ocino—we turn to two points which bear on the significance of that letter: federal tax credits and the provisions of the Vaccaro Ocino contract.

The tax credit program is a federal program which provides favorable financing for certain qualified housing programs. In New Jersey, it is administered by the New Jersey Housing and Mortgage Finance Agency (HMFA) which processes applications by prospective developers applying for the tax credits. The program is very competitive: many apply but few are chosen. Home asserts—and Ocino does not deny—that the contract of sale here anticipated Ocino's applying for tax credit financing, but did not make the contract contingent upon its obtaining that financing. Home also asserts, and again Ocino does not deny, that there were various other sources of financing (albeit not as favorable) which it could have sought for the project if it was unable to obtain tax credit approval.

As to the contract itself, Section 1.3.3, entitled *"Contingencies,"* deals with tax credits and also, together with Section 9.2, refers to the time of closing of the anticipated conveyance. Section 1.3.3(a) reads in its entirety as follows:

This agreement is expressly contingent upon Purchaser and Seller obtaining before the Closing all governmental approvals described on Exhibit B attached hereto and made a part hereof other than low income housing tax credits referred in Item C(7) and the municipal real property tax abatement referenced in Item A(5) on Exhibit B, the applications for which shall be submitted and diligently pursued by Purchaser. Seller acknowledges that the Purchaser is acquiring the Property for the purpose of constructing 375 senior citizen low income housing units that qualify for federal low income housing tax credits granted by the New Jersey Housing & Mortgage Finance Agency, plus 92 assisted living units. If the parties are unable to obtain all such approvals including federal low income housing tax credits for a minimum of 185 units and municipal real property tax abatement by December 31, 1997, Purchaser or Seller shall have the right to terminate this Contract, subject however to Purchaser's right to extend the contract as provided herein. Seller and Purchaser agrees to proceed diligently with all applications to obtain all of the above stated approvals. Purchaser agrees to apply to the New Jersey Housing & Mortgage Finance Agency for an allocation of federal low income housing tax credits to the Property for 185 units in the April, 1997 application cycle. Seller agrees to cooperate with Purchaser and to consent as owner of the Property to said applications if Seller's consent is required. Purchaser agrees to fund Seller's costs of obtaining the government approvals referred to above and as further described in Exhibit B.... As soon as tax credits are granted, Purchaser agrees to be responsible for the property expenses consisting of taxes, insurance and other related direct costs. *If tax credits are not granted in*

*this cycle, Purchaser may extend this contract, and if extended, Purchaser will
pay all property expenses as described above.*

[Emphasis added.]

Section 9.2, entitled "The Closing," reads as follows:

If neither party has exercised a right to cancel this Contract as stated herein and
all contingencies have been satisfied, it is understood and agreed that the closing of
title (herein called the "Closing") shall take place no later than December 31, 1997,
unless Contract is extended per P1.3.3a.

Home acquired the property from Vaccaro on February 18,
1998, approximately one and one-half months after the December
31, 1997 closing date referred to in the Vaccaro Ocino contract.
At that time, Ocino had not obtained any tax credit commitment
from the HMFA. Further, although the Middletown Planning
Board and governing body had initially approved its site plan in
April 1997, that approval was under challenge by Atlantic High-
lands because the approved plan varied from the terms of the
earlier settlement agreement. And, to add to Ocino's difficulties,
on March 4, 1998, COAH rejected Ocino's latest plan because it
varied from the earlier settlement agreement.

On April 13, 1998, after it had first notified Ocino of its purchase
from Vaccaro, and after a further letter on March 5, 1998,
demanding that Ocino comply with its obligations under the
contract, Home sent the time of the essence letter which forms the
crux of this suit. In it, Home noted that the contract provided for
closing "on or before December 31, 1997," but also provided that
"[i]f tax credits are not granted in this cycle, Purchaser may
extend this contract." Home then pointed out that the right to
extend the closing date is "explicitly limited to Purchaser's failure
to obtain low income housing tax credits" by December 31, 1997,
and also noted that no provision of the contract set "an outside
closing date should the Contract be extended." The letter then
proceeded to set "time of the essence" for closing, but related that
date to the possibility of Ocino's obtaining the desired tax credits
during the year 1998.

The letter contained four numbered paragraphs fixing a closing
date as follows: first, it referred to July 15, 1998, as the "date on

which the NJHMFA will announce whether Tax Credits are granted for the 1998 NJHMFA First Cycle." It provided that if Ocino did not obtain tax credits on that date (as part of the first cycle of tax credit grants for the year 1998), then closing would take place thirty days thereafter—that is, on August 14, 1998. However, if Ocino did obtain a commitment for tax credits in that 1998 first cycle, then closing would take place thirty days after September 30, 1998—that is, on October 30, 1998.

The provision for closing on August 14, 1998 (if Ocino did not get a tax credit commitment as part of the HMFA's first cycle 1998 award) contained a caveat. That provided, in substance, that if, after the HMFA had completed its first cycle awards, there remained at least $1,500,000 in tax credits to be awarded in the second cycle of 1998, then closing need not occur on August 14, 1998, but rather Ocino would have an opportunity to participate in that final cycle award which was to be made on October 15, 1998. If at that time Ocino was not selected to participate in the final cycle of 1998 grants, then closing would take place thirty days after October 15, 1998, which is to say on November 14, 1998. Finally, the letter provided that if Ocino did receive a tax credit award on October 15, 1998, closing would take place thirty days after December 31, 1998—on January 30, 1999.

The April 13 letter from Home Properties included a few other provisions worthy of note. After setting out the foregoing list of prescribed dates for closing, Home included the following paragraph:

> Given that the provision enabling the extension of the Contract beyond December 31, 1997 is expressly limited to an unfavorable decision by the NJHMFA for the 1997 application cycle, the time of the essence provision imposed, which provides Purchaser with the full opportunity to pursue any and all possible Tax Credits within the 1998 application cycle, is more than reasonable.

The letter then concluded by asking for "Purchaser's formal acknowledgment and consent to the foregoing." In the absence of such an acknowledgment, Home said it would "institute litigation for a declaration of the rights of the parties and the enforcement of the foregoing."

Ocino did not respond to Home's letter, and thus Home, presumably concluding (correctly) that Ocino would not participate in a closing on August 14, 1998, filed suit on May 20, 1998. Its complaint recited the existence and nature of the contract it had with Ocino, its demand for a time of the essence closing, the lack of any response from Ocino, and claimed that its notice was reasonable and should be enforced. It asked for a declaration of the rights and obligations of the parties under the contract, and specifically for a declaration that if Ocino did not get a tax credit commitment in the 1998 first cycle (or some indication of a possible commitment in the second 1998 cycle), it was obligated to close on August 14, 1998, or in default thereof it would have no rights under the contract.

When the HMFA announced its awards on July 15, 1998, Ocino was not granted tax credits. Further, the funds remaining for possible award in a second cycle in 1998 were minimal, and not close to the $1,500,000 specified in the time of the essence letter. Accordingly, the applicable date for closing, pursuant to Home's letter, was August 14, 1998.

On August 5, 1998, Home again wrote to Ocino. It referred to its April 13, 1998 letter, noted the results of the HMFA award on July 15, 1998 (as summarized above), and specified that accordingly "closing shall be held on August 14, 1998."

The fast relief which Home apparently sought by filing its suit even before August 14, 1998, was not to be. First, Ocino failed to answer within the prescribed time and Home obtained a default. Ocino then moved successfully to set aside the default, and Home moved for summary judgment. That relief was denied and the matter then proceeded to trial on June 9 and June 10, 1999, with the Law Division rendering its decision on July 26, 1999. In the meantime, Home formally declared the contract "terminated" on August 19, 1998, after Ocino refused to participate in the August 14, 1998 closing that Home had prescribed.

I

When a contract for the sale of real property does not provide that a stated closing date is "of the essence," either party may make time "of the essence" by serving a notice thereof on the other party, provided that the notice is reasonable. *See Paradiso v. Mazejy,* 3 *N.J.* 110, 69 *A.*2d 15 (1949); *Finn v. Glick,* 42 *N.J.Super.* 514, 127 *A.*2d 204 (App.Div.1956). That was the situation here. The contract had not made time of the essence for closing. However, when closing was delayed beyond the originally anticipated date, Home had a right to fix a time of the essence closing, provided the time fixed was "reasonable." We are satisfied the notice here was indeed "reasonable," and thus it was enforceable.

The contract language provided for an anticipated closing date not later than December 31, 1997. It also made clear that Ocino had a right to extend that date, but it did not provide any limit on that extension period, or prescribe any method of fixing such an extended closing date. However, the contract also made clear that the closing date and any extension related to Ocino's attempt to obtain tax credit financing.

Thus, the method by which Home fixed the time of the essence date for closing in 1998 made sense. It took account of the reason provided in the contract for extending closing beyond December 31, 1997. The prescribed dates gave Ocino the opportunity to see the results of an application for tax credits for the first cycle in 1998, and (if there was any basis to hope for a better result in the second 1998 cycle) for the final 1998 cycle as well. Only after HMFA had made its decision and awarded tax credits for the year 1998, would Ocino be required to either close, with tax credit financing or some other form of financing, or terminate its rights under the contract.

It is significant that at no time did Ocino respond to Home's time of the essence letter by asking or demanding additional time to close. Had Ocino claimed that it was likely to obtain its tax credit financing within some specified reasonable future date, and

if there were some reason to credit that statement, there might have been a basis for compelling Home to grant such a reasonable extension. But Ocino never made any such request or claim. Home contends that neither in 1997 nor in 1998 did Ocino even meet basic preliminary requirements to be eligible for tax credit financing. Ocino does not deny that claim, and the materials submitted with Ocino's application to HMFA support Home's contention.

Indeed, Ocino's only response to Home's demand for a closing on a fixed date was to claim, as it continues to claim through its presentation on this appeal, that it had a right to delay closing in perpetuity, with no limitation of any kind, provided only that it paid taxes and related charges during that extended period. Ocino seems to claim it did not even have an obligation to file and process an application for tax credits, or to show that a reasonable delay in closing would allow it to obtain the tax credits which it had thus far been unable to obtain. The unreasonableness of that position is virtually self-evident. Absent an almost overwhelming showing that the parties to a contract intended such a one-sided, unreasonable construction, courts will not construe a contract as providing some perpetual right or option which one side can exercise against the other at any time in the future. *See, e.g., In re Estate of Miller,* 90 *N.J.* 210, 218, 447 *A.*2d 549 (1982).

In short, Home's notice was reasonable. It provided Ocino with an opportunity to obtain the tax credits it sought. It indicated a willingness to consider any accommodation Ocino might suggest. Home was not required to sit indefinitely, or in perpetuity, in a position where Ocino had contractual rights to purchase but no obligation to bring that purchase to a conclusion.

## II

We find no basis to conclude that Home waived its right to enforce the time of the essence notice, that it acted in any way inconsistent with the position it took by sending that notice, or

that it did anything which should deprive it of the right to rely on that notice.

The trial court's finding of waiver was based primarily on what it described as Home's continuing to deal with Ocino after the time of the essence closing date had passed and Home had declared the contract terminated. It referred particularly to Home's consenting to Ocino's submission of a new application to the municipal planning board, to its cooperation in Ocino's filing an application for tax credits in the year 1999, and to its cooperating with Ocino in a proceeding before COAH to increase the number of affordable housing units within the project from 94 to 375.

We find no basis for a "waiver" in any of those actions. Each action was taken because, as Home saw it, it was in the best interest of Home as well as Ocino. In none of those actions, nor in any other way, did Home ever indicate any ambiguity or show anything less than consistency in its claim that the contract had been terminated and that Ocino had no further rights in the property.

In its opinion, the court referred specifically to a November 4, 1998 letter from Home's attorney to Ocino which the court termed a "brave attempt to have the best of two conflicting positions based on expediency." We see no justification for that characterization.

In its letter, Home first made clear that its primary wish was to deal directly, itself, with COAH and HMFA. However, it said that COAH had refused to deal with Home because of the pending litigation between Home and Ocino. It also noted that Ocino had refused to permit Home to deal directly with its engineer, and thus Home had been severely hampered in its attempt to obtain any positive results in the COAH proceedings.

In view of that non-cooperation by Ocino, and after noting that Ocino's position "provides us with no alternative," Home said that it would provide necessary authorizations and cooperation for Ocino to proceed before COAH. It therefore offered to sign any

endorsement necessary to move the project along. However, in doing so, it made clear why it was extending that cooperation and also made clear its continuing position that Ocino had no rights in the property. Its letter set out those propositions in just so many words:

In order to mitigate potential damages and to facilitate the timely approval of an application and in consideration of the fact that your client has refused to allow us to work directly with the engineer, I have instructed my client to agree to endorse the application if it meets my client's approval. Basically, the timing of the judicial process and the position being taken by Ocino provides us with no alternative.

Notwithstanding the foregoing, we intend to continue to assert our rights with regard to the subject property, before the Board, COAH and the NJHMFA. We continue to assert to you, Ocino and the relevant agencies that your client's contract rights have terminated. Further, Ocino's actions in this regard may have caused us additional financial harm and may continue to do so and, therefore, may be the subject of additional damage claims.

My client's position and actions to be taken consistent therewith are done without prejudice to its rights and simply and only for the foregoing reasons.

We see nothing improper or inconsistent in that letter. Indeed, Home's position seems eminently reasonable. No matter the result of the dispute between Home and Ocino, one of them would, presumably, end up the owner of the property and whoever that would be would want COAH approval and, if possible, tax credit financing. To offer cooperation in that limited regard without in any way surrendering the position it had made, and continued to make, abundantly clear, was perfectly proper.

Nor do we see any basis for the trial court's describing Home's action as "an ambivalent fixing of a time of the essence date." We see nothing "ambivalent" in Home's action. Its position was clear and unequivocal. To propose cooperation in an effort to mitigate damages to either or both parties was not inconsistent with any action Home had taken or would take. We find no waiver.

In sum, Home served a reasonable, enforceable time of the essence notice on Ocino. Thereafter it did nothing inconsistent with that notice, nor did it waive any of its rights. Ocino failed to close on the prescribed date and provided no rational justification for its failure to do so. As noted above, we therefore reach the same ultimate conclusion as did the trial court—that Ocino's rights

under the contract of purchase have terminated—although we come to that conclusion via different reasoning. Appeals, however, are from decisions of a trial court and not from opinions of a trial court, *Glaser v. Downes,* 126 *N.J.Super.* 10, 16, 312 *A.*2d 654 (App.Div.1973), *certif. denied,* 64 *N.J.* 513, 317 *A.*2d 726 (1974), and thus we affirm.