**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2362-22
A-2593-22

DOUGLAS SCHWARZWAELDER,

     Plaintiff-Respondent,

v.

BHC MARKETING, LTD,
DRESSANDER & ASSOCIATES,
INC., SIMPLICITY FINANCIAL
MARKETING, INC. f/k/a
DRESSANDER BHC, INC. and
SIMPLICITY FINANCIAL
GROUP HOLDINGS, INC.,

     Defendants-Appellants.

_____

DOUGLAS SCHWARZWAELDER,

     Plaintiff-Appellant,

v.

BHC MARKETING, LTD,
DRESSANDER & ASSOCIATES,
INC., SIMPLICITY FINANCIAL
MARKETING, INC. f/k/a

DRESSANDER BHC, INC. and
SIMPLICITY FINANCIAL
GROUP HOLDINGS, INC.,

    Defendants-Respondents.

_____

Argued April 24, 2024 – Decided July 15, 2024

Before Judges Vernoia, Gummer, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1409-18.

John M. Badagliacca argued the cause for appellants BHC Marketing, Ltd., Dressander & Associates, Inc., Simplicity Financial Marketing, Inc. f/k/a Dressander BHC, Inc. and Simplicity Financial Group Holdings, Inc. in A-2362-22 and as respondents in A-2593-22 (Freeman Mathis & Gary, LLP, attorneys; John M. Badagliacca, of counsel and on the briefs).

Nicola G. Suglia argued the cause for appellant Douglas Schwarzwaelder in A-2593-22 and as respondent in A-2362-22 (Fleischer, Fleischer, & Suglia, PC, attorneys; Nicola G. Suglia, on the briefs).

PER CURIAM

    After a two-day bench trial, the trial judge entered a judgment against defendant Simplicity Financial Marketing, Inc. (SFMI), awarding plaintiff Douglas Schwarzwaelder $245,687.98. In these back-to-back appeals, which we consolidate for purposes of issuing a single opinion, SFMI appeals from the

judgment, arguing the judge erred in finding it liable based on a non-solicitation theory of liability plaintiff had not pleaded in the complaint, and plaintiff appeals from a subsequently-issued order, arguing the judge erred in disregarding his expert witness's testimony and in finding the contracts on which he had based this case were unmodified and terminable at will. We affirm the aspects of the order plaintiff challenges, reverse the remaining aspects of the order, and reverse the judgment.

I.

In 2018, plaintiff filed a complaint and an amended complaint based on two "marketing agreement[s]." The first agreement, dated August 1, 2011, was between Dressander & Associates, Inc., which was defined as the Company; Safe Harbor Financial, Inc.; "such person engaged in the Business . . . that may become a party to this Agreement," which was defined as Additional Agent or collectively with Safe Harbor as Agent; and plaintiff. The first agreement was executed by plaintiff and by the presidents of Dressander and Safe Harbor. The second agreement was dated September 1, 2011, and was between the same parties except BHC Marketing, Ltd., not Dressander, was identified as the Company. The second agreement was executed by plaintiff and the presidents of BHC Marketing and Safe Harbor.

A-2362-22

The agreements contained nearly identical terms. Business was defined as "the business of selling life insurance, long term care insurance, annuities, disability insurance and other similar products." Both the Company and the Agent were in that Business. As set forth in the agreements, the Company "desire[d] to offer Agent certain marketing incentives for marketing, selling, advertising and/or promoting the products offered by certain insurance companies, with which the Company has contracts," defined as Carriers. The parties to the agreements acknowledged plaintiff had "introduced them and was critical in the consummation" of the agreements.

Section one of the agreements, entitled "Sale of Products," provided:

> The Company shall provide Agent access to its Carriers, and Agent shall use reasonable efforts to sell the products of the Carriers. The Company acknowledges and agrees that the Agent also sells products from other carriers, and Agent's efforts are not exclusively for the Carriers of the company. This Agreement is being entered into to give an incentive to the Agent to sell the products of the Carriers through the Company. Agent and [plaintiff] acknowledge and agree that the Company has, and will continuously develop from and after the date of this Agreement, relationships with other agents located throughout the United States selling products of the Carriers, and that Company's efforts are not exclusively for the Agent or [plaintiff].

The parties' compensation structure was set forth in section two:

4

Notwithstanding any commissions, bonuses or other payments paid by the Carriers to the Agent and/or [plaintiff] and/or their employees, agents, producers, contractors and/or other agents, the Company shall retain twenty-five (25) basis points (.25%) of any and all compensation, commissions and fees paid to the Company by the Carriers attributable to sales by the Agent or [plaintiff] and/or their employees, agents, producers, contractors and/or other agents. All amounts payable hereunder shall be calculated by the Company each month and paid to the Agent within ninety (90) days after the end of said month. . . . Upon request, the Company and the Agent agree to provide [plaintiff] with a copy of all commission reports of the Agent or other documents reasonably requested by [plaintiff] within ten (10) days of such request.

The agreements, not in section two nor anywhere else, did not provide for any compensation to plaintiff.

Section seven, entitled "Termination," provided:

The Company may not terminate this Agreement for any reason, except that Company may terminate this Agreement immediately for cause as a result of the gross negligence or willful misconduct of Agent or [plaintiff]. The Agent may terminate this Agreement upon [plaintiff's] prior written consent. [Plaintiff] must receive prior written notice of any termination. [Plaintiff] may terminate this Agreement for any reason. The Company and the Agent may not reinstate this Agreement or enter into another agreement or relationship without [plaintiff's] prior written consent.[1]

---

[1] The second agreement contained an additional sentence in this section: "Sections 5, 8, 10, 11 and 15 shall survive termination of this Agreement."

The agreements contained a "Non-Solicitation/Non-Compete" clause in section eight:

> a. The Company covenants and agrees that during the term of this Agreement and for a period of two (2) years after termination of this Agreement for any reason, that the Company will not divert or attempt to divert any of the producers, dealers, agents or representatives of Agent or to itself or to anyone else, by direct or indirect inducement, directly or indirectly, for itself or through, on behalf of, or in conjunction with any person or business enterprise.
>
> b. The Company covenants and agrees that it shall not disclose any information about the Agent's producers, agents, representatives and/or employees to anyone else other than Carriers in connection with the sale of products pursuan[t] to this Agreement without the prior written consent of Agent.
>
> c. In the event the Company breaches this paragraph [eight], in addition to any other remedies available at law or in equity, the Agent shall be entitled to, and the Company shall pay to the Agent, an amount equal to all commissions, fees, bonuses, compensation and/or benefits paid to the Company relating to the Agent or the Agent's producers, dealers, agents or representatives, less twenty-five basis points (.25%).

Thus, the agreements provided compensation to the "Agent" in the event defendants violated the non-solicitation clause set forth in section eight. Section eight did not reference plaintiff, and the agreements did not provide for

6

compensation or any other type of damages to plaintiff in the event defendants violated the non-solicitation clause set forth in section eight.

In section fourteen of the agreements, the parties made the following representation:

> [Each] party shall not [sic]: (1) not take any action or fail to take any action which would defeat, diminish or interfere with the intent of this Agreement, (2) not take any action or fail to take any action which would intentionally decrease the gross revenues, assets and/or accounts of another party. . . .

Paragraph (g) of section fifteen of the agreements provided, among other things, that the agreements could "not be modified or amended other than by an agreement in writing signed by all parties."

Sometime in 2010 or 2011, Dressander and BHC Marketing were acquired by Simplicity Financial Group Holdings, Inc. Dressander and BHC Marketing became one entity, which was named SFMI in 2017. SFMI is an independent marketing organization (IMO) that acts as an insurance wholesaler, coordinating between insurance companies or carriers and independent retail insurance agents, enabling the agents to sell the products of the carriers that use SFMI as their IMO. Plaintiff acted as an external recruiter to provide SFMI with sales agents, such as Safe Harbor, to sell insurance products on behalf of SFMI.

7

On July 18, 2017, plaintiff sent an email to SFMI employee and former Dressander president Mike Dressander and SFMI commissions processor Ian Moore, stating he was "moving" a "group" to SFMI and proposing SFMI "simplify things" by sending the payment to plaintiff, instead of Safe Harbor or other additional agents, and plaintiff would then "redistribute" to them. Dressander replied, asking plaintiff: "Just to be clear . . . you now want overwrites and bonuses paid to you on this and future deals, correct? Anything you want us to change on existing deals?" In an August 8, 2017 email, Moore wrote to plaintiff: "Thanks for the updated list. I do show that we have these agents here . . . . Currently, I show them all pointing to you in our system and should pay to you as necessary." SFMI subsequently issued some checks directly to plaintiff.

On March 21, 2018, SFMI's controller and senior vice president of finance, Alicia Noyes, sent an email to several individuals including Moore and Bruce Donaldson, SFMI's president and chief executive officer, asking: "Why are we paying [plaintiff]? We have never shared any pass-through bonus with him directly in the past?" Donaldson replied the same day, requesting that the other recipients "get Alicia's question answered."

In March 2018, SFMI decided to terminate the agreements and stopped making payments. It advised the individual agents that had been referred to defendants to "find another home" and did not subsequently enter into written agreements with them. Until the last individual agent left in 2020, some agents continued to sell the products of SFMI's carriers but received only the commissions paid directly to them by the carrier and not the wholesale commission above the twenty-five basis points previously paid to Safe Harbor under the agreements. SFMI kept the wholesale commission.

In Counts I and II of the amended complaint, plaintiff alleged Dressander and BHC Marketing had breached section two of their respective agreements by retaining "more than twenty-five basis points on products sold by" plaintiff's producers or agents and had breached the agreements by "terminating [their] relationship with agents, producers and/or contractors of [p]laintiff." Plaintiff also cited section fourteen of the agreements. Plaintiff did not allege defendants had breached the non-solicitation clause of section eight or reference that clause or section anywhere in the complaint or amended complaint.

In Count VI, plaintiff stated he had expected "he and his downline would be properly compensated for . . . the downline's sale of products and/or services offered by [d]efendants." Plaintiff defined "downline" as the "producers/agents"

9

he had "placed" with defendants. Plaintiff asserted he was "entitled to a claim for unjust enrichment and/or quantum meruit" if defendants proved the agreements were invalid, void, or "expired."

In Counts III, IV, and V, plaintiff asserted causes of action based on conversion, fraud, and tortious interference, respectively. He withdrew the fraud claim before trial. The conversion and tortious-interference claims were dismissed after the presentation of plaintiff's case at trial.

During the pre-trial discovery phase of the case, defendants served written interrogatories on plaintiff, asking plaintiff to set forth the factual bases that supported his claim defendants had breached the agreements by retaining more than twenty-five basis points on products sold by plaintiff's producers or agents and by terminating its relationship with plaintiff's agents, producers, or contractors. Plaintiff responded by directing defendants to his answer to another interrogatory, which in turn directed defendants to all of the documents, pleadings, and filings he had produced in the case. When asked during his deposition for the basis of his breach-of-contract claims, plaintiff responded that defendants had "just stopped paying on selected entities," "kept all the money," and stopped paying the producers he had brought to them, some of whom stopped paying him. He made no reference to the non-solicitation clause.

10

Plaintiff testified on the first day of trial. Plaintiff characterized IMOs as "wholesaler[s]" who "wholesale their product to independent agents who then sell it at a retail level" to the ultimate consumers. According to plaintiff, when an agent makes a sale, the carrier pays a commission to the agent and a commission to the IMO. Plaintiff testified that to "incentivize" sales, an IMO may enter into a "pass-through agreement" in which it agrees to share with the selling agent some of the commission it receives from the carrier.

Plaintiff described the agreements at issue in this case as "pass-through agreements" and himself as an "external recruiter." According to plaintiff, defendants initially received compensation from the carrier; retained an amount based on the twenty-five basis points referenced in section two of the agreements; and sent any compensation above that amount to the agent he had recruited, Safe Harbor, who then would pay plaintiff. Plaintiff testified that payment arrangement was changed "years ago" such that defendants would send the additional compensation amount to plaintiff and plaintiff then would pay commission fees to the agent and individual sales agents.

Conceding the parties had not entered into a signed, written modification agreement, plaintiff asserted the agreement for that modification was made verbally and in email. Conceding the agreements did not contain a durational

11

term or expiration date, plaintiff testified he could terminate the agreements at any time and SFMI could terminate the agreements only under "certain circumstances, for cause of willful misconduct, [and] gross negligence[.]"

Plaintiff was not asked about the non-solicitation clause in paragraph eight of the agreements either on direct or cross-examination. When asked by defense counsel if he asserted he had the right to keep all of the money he claimed SFMI paid him, plaintiff responded: "I am absolutely claiming it. You kept all my guys. You kept all the production, and cut me off. Cut off me, cut off all my guys." Plaintiff, however, acknowledged the agents no longer sold any product through SFMI.

Gary Shulte testified on behalf of plaintiff as an expert in insurance and annuity sales. Shulte testified about "pass-through agreements" in which he personally had participated: pursuant to those agreements, a certain percentage of the compensation was paid to him, and he "passed through" that compensation "to the agent minus something for ourselves." Shulte testified the specific agreements at issue in this case provided that "of the compensation" received by defendants from the insurance carrier, defendants "will pass through all but a quarter point, . . . to [plaintiff]," not Safe Harbor even though it was the designated "Agent" in the agreements. However, Shulte confirmed it would not

12

be uncommon for plaintiff to have a separate agreement with Safe Harbor to be compensated from a portion of the commission fees transferred to Safe Harbor from defendants pursuant to the agreements. Shulte also testified about his understanding of the termination provision of the agreements. He was not asked and did not testify about the non-solicitation clause of the agreements.

During the second day of trial, Donaldson testified on behalf of defendants. He described his understanding of the agreements: they "existed until [they were] terminated, sort of at will" and they served as "effectively a recruiting agreement" and "a protective agreement for the recruiter. And the obligation is to not steal their business. That's the perpetual aspect." According to Donaldson, "the recruiting agreement, is really just saying at the end of the day, if we appoint your agents, and then we decide to get out of the arrangement because we can cancel any of those contracts, we're not going to then turn around and steal your business," referencing the sales agents referred to SFMI by Safe Harbor.

Donaldson testified that after SFMI terminated the agreements, Safe Harbor's sales representatives continued to sell insurance products on SFMI's behalf from March of 2018 through 2020. Donaldson characterized the continuation of Safe Harbor's sales following termination of the agreements "as

an accommodation to everybody involved" as a form of a soft landing because "[t]hat's what [the sales representatives] wanted."

Donaldson denied the agreements were ever modified, denied Moore or Dressander had authority to modify the agreements in 2017, asserted only he had authority to modify the agreements, denied he ever authorized Moore or Dressander to modify the agreements, and denied knowing about plaintiff's request to modify them.

Finding the issue before him was "whether or not there is a breach," the trial judge placed his decision on the record at the end of the second day of trial. Regarding plaintiff's unjust-enrichment and quantum-meruit claim, the trial judge explained he would not reach "either one of them, because I only reach either one of them [if] I don't find there to be a contract."

As to whether defendants had breached the agreements by not compensating plaintiff, the judge held the agreements clearly identified Safe Harbor as the Agent and sole entity to receive compensation from defendants. The judge gave "no weight to any opinions Mr. Shulte had" and he "did not find him persuasive in the least." The judge posited plaintiff likely had a separate agreement with Safe Harbor in which Safe Harbor had agreed to compensate plaintiff and noted plaintiff had not presented that agreement at trial. Regarding

14

the alleged modification of the agreements to provide all compensation to plaintiff instead of Safe Harbor, the judge found no "valid modification to the agreement[s]" because "there was no assent of an agent entity" as required by the agreements, meaning Safe Harbor had not consented in writing to a modification in which defendants would make the payments to plaintiff instead of Safe Harbor. He also found Moore and Dressander did not have the authority or apparent authority to enter into a modification on behalf of SMFI and plaintiff had not provided sufficient consideration for the modification. Thus, he held plaintiff had no contractual right to seek recovery based on the compensation provisions set forth in section two of the agreements.

Having found plaintiff was not entitled to recovery under section two of the agreements, the judge concluded he did not need to reach the issue of whether the agreements were "perpetual contract[s]." He nevertheless indicated that under either a preponderance-of-the-evidence or clear-and-convincing standard, he would find the agreements failed to contain the language necessary to make them "contract[s] for life" and that the agreements were "terminable at will."

Even though the judge had decided the breach-of-contract claims actually pleaded by plaintiff, his decision didn't end there. The judge held defendants

A-2362-22

had breached the non-solicitation clause of the agreements based on Donaldson's testimony that SFMI had continued to allow Safe Harbor sales representatives to sell insurance products on its behalf for approximately two years after termination of the agreements. The judge recognized the non-solicitation clause in the agreements expressly referenced "Agent," which he had held meant Safe Harbor, but he nevertheless applied the non-solicitation clause to plaintiff and awarded damages to plaintiff under it because he believed Donaldson had conceded the purpose of the agreements was to protect plaintiff.

The trial judge acknowledged plaintiff had not argued at trial defendants breached the non-solicitation clause, but he found "this is what the facts [the parties] presented to me as I find them to be . . . laid out to the [c]ourt." Although plaintiff had not alleged a breach of the non-solicitation clause in his pleadings, the judge found "the allegations related to breach of contract are sufficiently general to, [y]ou know, there wasn't cited any chapter and verse, [plaintiff] just generally says there's a breach of the contract. And because of that, the pleadings then conform to the evidence under our jurisprudence."

The judge awarded plaintiff $245,687.98, which was the amount, according to the parties' stipulation, of the wholesale commission Safe Harbor would have been entitled to receive under the agreements for the sales its

16

representatives made from March of 2018 through 2020. The judge concluded he did not need to reach plaintiff's claim for unjust enrichment and quantum meruit because he had found "a remedy at law based on the contract."

The judge entered a judgment on March 6, 2023, awarding plaintiff $245,687.98 from SFMI. On April 11, 2023, SFMI filed a notice of appeal of that judgment. On May 1, 2023, the judge entered another order memorializing the decision he had placed on the record and expressly finding SFMI had "agreed to pass through all of its wholesale commissions in connection with the subject marketing agreements . . . except for a retention of [twenty-five] points"; Schulte's testimony was not entitled to any weight; the agreements were not validly modified to make plaintiff the payee; the agreements were terminable at will; SFMI had breached the non-solicitation clause in the agreements; and SFMI was liable to plaintiff "in the amount of $245,68[7].98 for [d]efendant's breach of the non-solicitation clause." On May 2, 2023, plaintiff filed a notice of appeal of that order, expressly appealing from the paragraphs of the order regarding the modification, the terminable-at-will nature of the agreements, and plaintiff's expert witness.

On appeal, SFMI argues the trial judge improperly relied on Rule 4:9-2 and violated its due-process rights by creating, interjecting, and finding a breach

of contract based on a non-solicitation theory plaintiff had not pleaded in his complaints. SFMI also argues the judge erred in its analysis and interpretation of the non-solicitation clause of the agreements and in finding it had breached that clause. Lastly, SFMI contends the damages award was a windfall to plaintiff unsupported by the record. In his appeal, plaintiff argues the judge erred in disregarding Shulte's testimony, in finding invalid the modification he claimed had been made to the agreements to make him the payee, and in finding the agreements to be terminable at will.

## II.

Our "review of a judgment following a bench trial is limited." Accounteks.net, Inc. v. CKR Law, LLP, 475 N.J. Super. 493, 503 (App. Div. 2023). "The trial court's factual findings are entitled to deference on appeal so long as they are supported by sufficient credible evidence in the record." Ibid. Moreover, "[d]eference is particularly appropriate when the court's findings depend on credibility evaluations made after a full opportunity to observe witnesses testify, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and the court's 'feel of the case,'" Accounteks.net, Inc., 475 N.J. Super. at 503 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). For that reason, "[i]n reviewing the judge's findings, '[w]e do not weigh the evidence, assess the credibility of witnesses, or

make conclusions about the evidence.'" 160 W. Broadway Assocs., LP v. 1 Memorial Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021) (second alteration in original) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)).

We "owe no deference to the judge's interpretation of the law and the legal consequences that flow from established facts." Ibid. "A trial court's interpretation of a contract is subject to de novo review." Accounteks.net, 475 N.J. Super. at 504. "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). "The court's role is to consider the agreement's terms 'in the context of the circumstances under which it was written,' 'accord to the language a rational meaning in keeping with the expressed general purpose[,]' and apply the agreement accordingly." Accounteks.net, 475 N.J. Super. at 504 (alteration in original) (quoting Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 269 (2006)). The "court's task is 'not to rewrite a contract for the parties better than or different from the one they wrote for themselves.'" Globe Motor Co. v. Igdalev,

225 N.J. 469, 483 (2016) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

To establish a breach-of-contract claim, the plaintiff must prove (1) "the parties entered into a contract containing certain terms," (2) "plaintiff did what the contract required [them] to do," and (3) "defendant did not do what the contract required [them] to do." Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 56 (2024). The plaintiff must also demonstrate (4) the "alleged breach 'caused [them] a loss.'" Robey v. SPARC Grp. LLC, 256 N.J. 541, 565 (2024) (quoting Goldfarb v. Solimine, 245 N.J. 326, 338 (2021)).

A.

We address first SFMI's challenge to the judgment. "A litigant in civil proceedings is entitled to a fair hearing, imbued with the protections of due process." In re Adoption of Child ex rel. M.E.B., 444 N.J. Super. 83, 88 (App. Div. 2016). "In the context of litigation, fundamental due process demands a party be given adequate notice and a reasonable opportunity to be heard." Ibid. "Our Supreme Court has observed, '[d]ue process is not a fixed concept . . . but a flexible one that depends on the particular circumstances,' but '[f]undamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner.'" McGory v. SLS Landscaping,

463 N.J. Super. 437, 453 (App. Div. 2020) (quoting <u>Doe v. Poritz</u>, 142 N.J. 1, 106 (1995)).

Moreover, "in accordance with due process principles, the opportunity to be heard 'includes not only the right to cross-examine the adversary's witnesses but also the right to present witnesses to refute the adversary's evidence.'" <u>Ibid.</u> (quoting <u>Paco v. Am. Leather Mfg. Co.</u>, 213 N.J. Super. 90, 97 (App. Div. 1986)). Additionally, "[a]n appropriate regard for the orderly judicial process requires that parties be given fair opportunity to pass on points critical to their cases." <u>Too Much Media, LLC v. Hale</u>, 413 N.J. Super. 135, 170 (App. Div. 2010) (quoting <u>Rivera v. Gerner</u>, 89 N.J. 526, 538 (1982)). For those reasons, "courts must guard against sua sponte action or 'resort[ing] to a "shortcut" for the purposes of "good administration" and circumvent[ing] the basic requirements of notice and an opportunity to be heard.'" <u>Myska v. N.J. Mfrs. Ins. Co.</u>, 440 N.J. Super. 458, 483 (App. Div. 2015) (alterations in original) (quoting <u>Klier v. Sordoni Skanska Constr. Co.</u>, 337 N.J. Super. 76, 84-85 (App. Div. 2001)).

In accordance with procedural safeguards required to afford parties due process, notice of the claims at issue must be raised in a complaint. <u>Bauer v. Nesbitt</u>, 198 N.J. 601, 610 (2009). "If not pled in a complaint, a cause of action

cannot spring to life for the first time" following the completion of a trial. Ibid. "The basic function of a complaint is to 'fairly apprise an adverse party of the claims and issues to be raised at trial.'" Ibid. (quoting Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 75 (1990)). Although pleadings of a complaint "'shall be liberally construed in the interest of justice,' R. 4:5-7, the fundament of a cause of action, however inartfully it may be stated, still must be discernible within the four corners of the complaint," Bauer, 198 N.J. at 610. Moreover, "[a] thoroughly deficient complaint—a complaint that completely omits the underlying basis for relief—cannot be sustained as a matter of fundamental fairness." Ibid. "An opposing party must know what it is defending against; how else would it conduct an investigation and discovery to meet the claim?" Ibid.

The court's application of and award of damages under a theory of liability based on a breach of the agreements' non-solicitation clause was a clear violation of defendants' due-process rights and a misreading of the agreements. Plaintiff concedes his case "focused largely on [d]efendant's failure to pay [p]laintiff the basis points owed and [d]efendant's attempts to terminate the [m]arketing [a]greements." He argues the complaint and amended complaint "set forth claims for breach of the [m]arketing [a]greements generally, and the entirety of

the [m]arketing [a]greements were attached to and incorporated into plaintiff's pleadings" and that that was enough to put defendants on notice of a claim based on the non-solicitation clause. It wasn't.

The pleadings expressly put defendants on notice plaintiff claimed a breach of the compensation provision under section two of the agreements and the termination provision under section seven. They did not, however, put defendants on notice they had to defend against a claim of a breach of the non-solicitation clause in section eight. And attaching copies of two ten-page agreements containing fifteen sections and multiple subparagraphs isn't enough to put defendants on notice they had to defend against a claim of a breach of the non-solicitation clause of the agreements. Neither plaintiff's written discovery responses nor his deposition testimony given in response to direct questions about the bases of his claims gave defendants any reason to think he was claiming a breach of the non-solicitation clause. See Stewart v. N.J. Tpk. Auth./Garden State Parkway, 249 N.J. 642, 657-58 (2022) (refusing to consider an "eleventh hour" change in theory of liability when the plaintiffs had "failed to mention anything regarding the [new theory] in their complaint or throughout . . . discovery"). Defendants were deprived of an opportunity to prepare a

defense to and present evidence on a non-solicitation claim they had no reason to think would be a part of the trial.

Plaintiff's and the trial judge's reliance on Rule 4:9-2 is misplaced. As we held in R. Wilson Plumbing & Heating, Inc. v. Wademan:

> [Rule 4:9-2] does not . . . permit the trial court to enter judgment against a party on a cause of action which is conceived of by the judge only after submission of the case to him for decision, which comes as a complete surprise to all the litigants, and whose post-trial interjection in the case obviously prejudices the litigant who is accorded no opportunity to offer a factual or legal defense.
>
> . . . .
>
> "Although under R[ule] 4:9-2 the claims of a party may be deemed amended to conform to the proofs at a trial, such amendment should be at the behest of a party and should be granted only if there is a full hearing where the evidence and arguments for and against the issue may be considered."
>
> [246 N.J. Super. 615, 617-18 (App. Div. 1991) (quoting Essex Cnty. Adjustor v. Brookes, 198 N.J. Super. 109, 114 (App. Div. 1984)).]

After the trial was over, with no notice to the parties, the trial judge unilaterally imposed and awarded damages based on a new theory of liability. Plaintiff did not ask the judge to consider a new theory of liability based on the non-solicitation clause. The judge did not conduct "a full hearing where the

evidence and arguments for and against the issue [were] considered," ibid., and did not give defendants an opportunity to argue against the application of the new theory or present evidence about it.

In addition to being fatally unfair procedurally, the judge's imposition of the theory of liability based on the non-solicitation clause was legally unsound. To determine the enforceability of a non-compete agreement, courts undertake a factored analysis:

> With regard to a non-compete agreement, also known as a restrictive covenant, a court will deem the covenant enforceable so long as it "simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, . . . is not injurious to the public," and the particular restrictions imposed are reasonable as to duration, area, and scope of activity.
>
> [Accounteks.net, 475 N.J. Super. at 504 (quoting Solari Indus., Inc. v. Malady, 55 N.J. 571, 576 (1970)).]

Having deprived defendants of the opportunity to argue against the enforceability of the non-solicitation clause, the judge failed to engage in his own analysis of its legal enforceability.

And in awarding damages to plaintiff under the non-solicitation clause, the judge disregarded the clear language of the agreements. Section eight of the agreements provided that in the event of a breach of the non-solicitation clause:

"the Agent shall be entitled to, and the Company shall pay to the Agent, an amount equal to all commissions, fees, bonuses, compensation and/or benefits paid to the Company relating to the Agent or the Agent's producers, dealers, agents or representatives, less twenty-five basis points (.25%)."

At the outset of his opinion, the trial judge correctly held the "plain language" of the agreements "clearly identified" Safe Harbor, not plaintiff, as the Agent under the agreements. Yet, inexplicably and contrary to the finding he already had made, the judge held "Agent" in the non-solicitation clause meant plaintiff. The judge had it right the first time. Agent means Safe Harbor under the clear language of the agreements, and the judge erred in awarding damages to plaintiff when the non-solicitation clause provided damages for a breach of that clause would be paid to the Agent, Safe Harbor, not plaintiff. A trial judge can't "rewrite a contract for the parties better than or different from the one they wrote for themselves." Globe Motor Co., 225 N.J. at 483 (quoting Kieffer, 205 N.J. at 223).

For these reasons, we hold the trial judge erred in finding defendants had breached the non-solicitation clause of the agreements and in awarding plaintiff damages based on the purported breach. Accordingly, we reverse the March 6,

26

2023 judgment and remand with directions the trial court enter a judgment in defendants' favor.

B.

We now address plaintiff's partial appeal of the May 1, 2023 order.[2]

Plaintiff first challenges the judge's decision to give no weight to Shulte's opinions. The judge did not exclude Shulte's testimony on the basis he was unqualified, because it consisted of net opinions, or for any other reason. He simply did not find Shulte credible: "I'm giving no weight to any opinions Mr. Shulte had. I did not find him persuasive in the least."

"A factfinder is not required to accept an expert's opinion. In the same manner as a jury, a judge sitting as factfinder may accept some parts of a witness's testimony and reject other parts." E&H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 29 (App. Div. 2018). The judge, as factfinder, "must weigh and evaluate the experts' opinions, including their credibility, to fulfill the judge's responsibility in reaching a reasoned, just and factually supported

---

[2] Plaintiff does not appeal the aspect of the order awarding damages solely on the basis of the breach of the non-solicitation clause and did not argue in his briefs he was entitled to an award under other causes of action set forth in his pleadings. Accordingly, he has waived those arguments. See Arsenis v. Borough of Bernardsville, 476 N.J. Super. 195, 204 (App. Div. 2023) ("[A]n issue not briefed is deemed waived." (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2023))), certif. denied, 257 N.J. 524 (2024).

A-2362-22

conclusion." Pansini Custom Design Assocs., LLC v. City of Ocean City, 407 N.J. Super. 137, 144 (App. Div. 2009). We "generally defer to a trial court's credibility findings about the testimony of expert witnesses." State v. J.L.G., 234 N.J. 265, 301 (2018); see also State v. Locurto, 157 N.J. 463, 474 (1999) ("Appellate courts should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record."). We "defer to the [trial] court's factual and credibility findings provided they are supported by sufficient credible evidence in the record." State v. Washington, 475 N.J. Super. 292, 300 (App. Div. 2023).

We perceive no abuse of discretion in the judge's determination Shulte lacked credibility. As the judge pointed out, Shulte testified "Agent" in the agreements meant plaintiff even though the agreements clearly defined "Agent" as Safe Harbor. With that statement, which directly contradicted the plain language of the agreements, and his proffered explanation that he was "guessing" that the attorney who drafted the agreements had "made a mistake," Shulte rendered incredible his testimony, a determination the judge was free to apply to that portion of his testimony or all of his testimony. See Model Jury Charges (Civil), 1.12K, "Credibility (short version)" (approved Nov. 1998)

("Regardless of whether the witness is a lay person or expert, you may believe everything a witness said or only part of it or none of it.").  We have no reason and no legal basis to find Shulte more credible than the trial judge who witnessed his testimony did.

Plaintiff also challenges the judge's determination that the agreements were not validly modified to make plaintiff the payee.  In making that finding, the judge correctly interpreted the plain language of the agreements, which expressly addressed how the agreements could be modified:  "This Agreement may not be modified or amended other than by an agreement in writing signed by all parties."  But there was "no agreement in writing signed by all parties" that modified the agreements to make plaintiff, not Safe Harbor, the payee.  To support his argument the agreements were modified, plaintiff relies on copies of a few checks and emails that did not include Safe Harbor but were between him and a couple of defendants' employees, who, as the judge found, had neither the authority nor apparent authority to modify the agreements on behalf of defendants.  See Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 27 (App. Div. 2021) (finding that an agent may bind his principal only for such acts that are within his actual or apparent authority).  Those documents don't

constitute or prove the existence of a modification "agreement in writing signed by all parties."

Finally, plaintiff challenges the judge's determination that if he needed to reach the issue of whether the agreements were "perpetual contract[s]," he would find the agreements failed to contain the language necessary to make them "contract[s] for life" and that the agreements were "terminable at will." We agree with the judge that he did not need to reach the issue and, alternatively, the agreements were terminable at will.

The judge did not need to reach the issue because he had correctly found plaintiff was not a payee under the agreements and, thus, had not established an entitlement to damages in the event of a breach of the agreements. Under the express language of the agreements, only the defined agent, Safe Harbor, was entitled to compensation as set forth in section two of the agreements or entitled to damages in the event of a breach of the agreements by defendants.

"Perpetual contractual performance is not favored in the law and is to be avoided unless there is a clear manifestation that the parties intended it." In re Est. of Miller, 90 N.J. 210, 218 (1982). "Ordinarily, if a contract contains no express terms as to its duration, it is terminable at will or after a reasonable time." Id. at 219. "[W]hen parties to a contract have not agreed in respect of a

term that is essential to a determination of their rights and duties, a term that is reasonable in the circumstances is supplied by the court." Ibid. (citing Restatement (Second) of Conts. § 204 (Am. L. Inst. 1981)).

Even when a contract requires continuing performance, though, it may be interpreted as requiring "performance for a reasonable time, or until terminated by a reasonable notice." Borough of W. Caldwell v. Borough of Caldwell, 26 N.J. 9, 30 (1958). "Absent an almost overwhelming showing that the parties to a contract intended such a one-sided, unreasonable construction, courts will not construe a contract as providing some perpetual right or option which one side can exercise against the other at any time in the future." Home Props. of N.Y. v. Ocino, 341 N.J. Super. 604, 613 (App. Div. 2001); see also N.Y. v. N.J., 598 U.S. 218, 224 (2023) (finding "a contract . . . that contemplates 'continuing performance for an indefinite time is to be interpreted as stipulating only for performance terminable at the will of either party.'" (quoting 1 Williston on Contracts § 4:23, p. 570 (Lord ed., 4th ed. 2022))).

Plaintiff has not met that standard. The agreements do not contain express language establishing their duration or a perpetual obligation under their terms. And the record does not contain any, much less overwhelming, evidence the parties intended defendants to be forever bound to plaintiff and Safe Harbor.

We are not persuaded by plaintiff's argument the termination provision of the agreements establishes an intent to create a never-ending contract. Accordingly, we see no basis to reverse the judge's findings regarding the terminability of the agreements or the other provisions of the May 1, 2023 order that plaintiff appeals.

Reversed as to the March 6, 2023 judgment; affirmed in part as to the aspects of the May 1, 2023 order disregarding the opinions and testimony of plaintiff's expert witness and finding the agreements were terminable at will and had not been modified; reversed as to the remaining aspects of the May 1, 2023 order; and remanded with directions the trial court enter a judgment in defendants' favor. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION